503 F.2d 1250
 THE BELL TELEPHONE COMPANY OF PENNSYLVANIA and the American
Telephone and Telegraph Company, Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and The United States of
America,Respondents, MCI Telecommunications
Corporation and MCI-New York West, Inc.,
etal., Intervenors.
 No. 74-1386.
 United States Court of Appeals, Third Circuit.
 Argued June 27, 1974.
Decided Sept. 11, 1974.
 
 Irving R. Segal, Schnader, Harrison, Segal & Lewis, John B. King, Philadelphia, Pa., Charles A. Horsky, Michael Boudin, E. Edward Bruce, Charles E. Lister, Washington, D.C.
 Charles Ryan, Alfred C. Partoll, Harold S. Levy, New York City, for petitioners; F. Mark Garlinghouse, New York City, of counsel.
 Thomas E. Kauper, Asst. Atty. Gen., Carl D. Lawson, Seymour H. Dussman, Dept. of Justice, Washington, D.C., Ashton R. Hardy, Gen. Counsel, Joseph A. Marino, Associate Gen. Counsel, Philip V. Permut, Federal Communications Commission, Washington, D.C., for respondents.
 
 
 1
 Michael L. Glaser, Francis E. Fletcher, Jr., Glaser & Fletcher, P.C., Washington, D.C., James T. Roche, Vienna, Va., for intervenor, Data Transmission Co.; John M. Scorce, Vienna, Va., of counsel.
 
 
 2
 Wm. Warfield Ross, William R. Weissman, C. Coleman Bird, Wald, Harkrader & Ross, Jack Werner, Laurence Singer, Washington, D.C., for intervenor, The Western Union Telegraph Co.; Richard C. Hostetler, Upper Saddle River, N.J., of counsel.
 
 
 3
 Max L. Lieberman, Pelino, Wasserstrom, Chucas & Monteverde, Philadelphia, Pa., for intervenor, N-Triple-C, Inc.
 
 
 4
 Thormund A. Miller, Richard S. Kopf, San Francisco, Cal., Herbert E. Forrest, Steptoe & Johnson, Washington, D.C., for intervenor, Southern Pacific Communications Co.
 
 
 5
 W. Theodore Pierson, Jr., Mark J. Tauber, Washington, D.C., for intervenor, CML Satellite Corp.; Marvin R. Jawer, Washington, D.C., of counsel.
 
 
 6
 Harry M. Plotkin, Gary M. Epstein, Arent, Fox, Kintner, Plotkin & Kahn, Michael H. Bader, Kenneth A. Cox, William J. Byrnes, Haley, Bader & Potts, Washington, D.C., for intervenors, MCI Telecommunications Corp. and MCI-New York West, Inc., John R. Worthington, Kaye L. O'Riordan, Washington, D.C., of counsel.
 
 
 7
 John D. Jackson, David A. Irwin, Germantown, Md., for intervenor, American Satellite Corp.
 
 
 8
 Richard H. Strodel, Wheeler & Wheeler, Washington, D.C., for intervenor, Western Tele-Communications, Inc.
 
 
 9
 Jay E. Ricks, Robert R. Bruce, Hogan & Hartson, Washington, D.C., for intervenor, CPI Microwave, Inc.
 
 
 10
 Thomas J. O'Reilly, Washington, D.C., for intervenor, United States Independent Telephone Association; Chadbourne, Parke, Whiteside, Washington, D.C., of counsel.
 
 
 11
 Alan Y. Naftalin, Koteen & Burt, Washington, D.C., Francis J. DeRosa, New York City, for intervenor, RCA Global Communications, Inc.
 
 
 12
 Before HASTIE, WEIS and GARTH, Circuit Judges.
 
 OPINION OF THE COURT
 
 13
 GARTH, Circuit Judge.
 
 
 14
 Petitioners Bell Telephone Company of Pennsylvania and American Telephone and Telegraph Company call upon us to review[1] an order of the Federal Communications Commission dated April 23, 1974 (FCC Docket No. 19896).[2] The order, relevant portions of which are found in the appendix to this opinion, essentially requires the petitioners to provide certain communications services and facilities to other carriers and prohibits the petitioners from engaging in discriminatory practices. Specifically, the first two paragraphs of the order (P53-54) require the American Telephone and Telegraph Company and affiliated Bell System companies (hereinafter 'A T & T') to furnish to MCI Telecommunications Corp. (MCI) and to all other specialized common carriers the interconnection facilities necessary to provide private line services.[3] The order requires that A T & T must provide the interconnection necessary for the delivery of two particular elements of private line service, Foreign Exchange service (FX) and Common Control Switching Arrangements.[4] The order further directs A T & T to cease and desist from practices which delay interconnection for the specialized common carriers and which deny services to these carriers on a par with A T & T's own private lines service division, the Long Lines Department. The third paragraph of the order (P55) rejects tariffs submitted by A T & T to the extent that such tariffs are inconsistent with prior contracts entered into between A T & T and Western Union.
 
 
 15
 Inasmuch as the two matters before the Commission involve completely distinct legal issues, we shall treat the issues separately.
 
 I. FX and CCSA
 A. Background
 
 16
 To evaluate the FCC's mandate regarding FX and CCSA, it is necessary to examine the agency's prior involvement with the specialized common carriers. The Commission first considered the provision of private line services by specialized common carriers in In re Applications of Microwave Communications, Inc., 18 F.C.C.2d 953 (1969) (Docket No. 16509), reconsideration denied, 21 F.C.C.2d 190 (1970). MCI had proposed to construct facilities for the development of interoffice and interplant communication between St. Louis and Chicago. MCI agreed to be responsible only for the transmissions between microwave transmitters, leaving it to the individual customers to arrange for 'loop service' (i.e. interconnection between MCI's transmitter/receiving terminals and the customer's own equipment). Concluding that it would be inconsistent with the public interest to deny MCI's applications, the Commission granted construction permits for this proposed point-to-point service. Recognizing that MCI's customers might have difficulties in obtaining loop service, the FCC declared:
 
 
 17
 Since (the existing carriers) have indicated that they will not voluntarily provide loop service, we shall retain jurisdiction of this proceeding in order to enable MCI to obtain from the Commission a prompt determination on the matter of interconnection. Thus, at such time as MCI has customers and the facts and details of the customers' requirements are known, MCI may come directly to the Commission with a request for an order of interconnection.
 
 
 18
 18 F.C.C.2d at 965 (1969).
 
 
 19
 Less than two years later, the FCC conducted a full-scale investigation into the provision of private line services. See Specialized Common Carrier Services, 29 F.C.C.2d 850 (Docket No. 18920), reconsideration denied, 31 F.C.C.2d 1106 (1971). The Notice of Proposed Rule Making, issued in 1970, indicated that the FCC was concerned with five basic issues:
 
 
 20
 A. Whether as a general policy the public interest would be served by permitting the entry of new carriers in the specialized communications field; and if so:
 
 
 21
 B. Whether comparative hearings on the various claims of economic mutual exclusivity among the applicants are necessary or desirable in the circumstances;
 
 
 22
 C. What standards, procedures and/or rules should be adopted with respect to such technical matters as the avoidance of interference to domestic communications satellites in the 6 GHz band, the avoidance or resolution of terrestrial frequency conflicts and route blockages both vis-a-vis the facilities of established carriers and among the applicants, and the use of frequency diversity;
 
 
 23
 D. Whether some measure of protection to the applicants' subscribers is called for in the area of quality and reliability of service; and
 
 
 24
 E. What is the appropriate means for local distribution of the proposed services?
 
 
 25
 24 F.C.C.2d 318 (1970). Of these five issues, the first and last have special relevance to the instant proceedings. As to issue 'A', the Commission concluded that:
 
 
 26
 . . . there is a public need and demand for the proposed facilities and services and for new and diverse sources of supply, competition in the specialized communications field is reasonably feasible, there are grounds for a reasonable expectation that new entry will have some beneficial effects, and there is no reason to anticipate that new entry would have any adverse impact on service to the public by existing carriers such as to outweigh the considerations supporting new entry. We further find and conclude that a general policy in favor of the entry of new carriers in the specialized communications field would serve the public interest, convenience, and necessity.
 
 
 27
 29 F.C.C.2d at 920 (1971). The Commission's conclusion with regard to issue 'E' was as follows:
 
 
 28
 We reaffirm the view expressed in the Notice (paragraph 67) that established carriers with exchange facilities should, upon request, permit interconnection or leased channel arrangements on reasonable terms and conditions to be negotiated with the new carriers, and also afford their customers the option of obtaining local distribution service under reasonable terms set forth in the tariff schedules of the local carrier. Moreover, as there stated, 'where a carrier has monopoly control over essential facilities we will not condone any policy or practice whereby such carrier would discriminate in favor of an affiliated carrier or show favoritism among competitors.' In view of the representations of A T & T and G T & E in this proceeding, upon which we rely, and the self-interest of other independent telephone companies in not losing potential new business, there appears to be no need to say more on this question at this time. Should any future problem arise, we will act expeditiously to take such measures as are necessary and appropriate in the public interest to implement and enforce the policies and objectives of this Decision.
 
 
 29
 29 F.C.C.2d at 940 (1971).
 
 
 30
 A T & T did not appeal the order entered in Specialized Common Carrier Services.[5] Presumably as a result of this 1971 decision, A T & T and MCI began negotiating for the provision of interconnection services. However, in the late summer of 1973, A T & T and its affiliates broke off negotiations with MCI and submitted tariffs to public utility commissions in each of the states in which MCI sought interconnection. Pending approval of these tariffs, A T & T announced that it would not provide interconnection to MCI if such services 'terminated' in A T & T supplied equipment.
 
 
 31
 On August 27, 1973, MCI wrote to the FCC, requesting that the Commission advise A T & T that:
 
 
 32
 (1) the (A T & T) affiliates providing services for the St. Louis-Chicago route are required to interconnect with MCI 'in the provision of the interstate service which MCI is authorized by the FCC to provide'; (2) A T & T must provide interconnection services to MCI on the same terms that such services are provided to Western Union and the Long Lines Department of A T & T; and (3) A T & T may not resort to state regulatory commissions as a method of delaying the provision of authorized services.
 
 
 33
 The Commission's response was prepared by Bernard Strassburg, Chief of the Common Carrier Bureau. In a letter to A T & T (dated August 31, 1973), Mr. Strassburg, after quoting from the MCI (Docket 16509) and Specialized Common Carrier Services (Docket 18920) decisions discussed above, stated that:
 
 
 34
 '. . . It is our view that, as requested by MCI, the associated Bell companies are required to permit interconnection or provide local channel arrangements to MCI. As the Commission also stressed in its MCI and Specialized Common Carrier decisions, the Bell companies must treat MCI no less favorably in interconnecting its facilities than they do now for the Long Lines Department of A T & T or Western Union. It should also be apparent that the Associated Bell companies are not required to obtain approval from any state or local regulatory agency of any contract or tariff before they may provide interstate services or facilities to MCI for its interstate services.'
 
 
 35
 Strassburg also informed A T & T that it was obligated to provide 'local distribution services' (i.e. looping service; see p. 3, supra) to MCI customers in Chicago and St. Louis.
 
 
 36
 A T & T answered Strassburg's letter on September 5, 1973. A T & T informed the Commission that it would provide local loop service to MCI, but that it could do so only after first receiving clearance from the appropriate state regulatory commissions. A T & T further declared that it had no intention of participating in a 'through service' with MCI, Western Union, or any other private lines carrier. On September 28, 1973, A T & T reaffirmed its commitment to proceed first before the state commissions, noting that it had filed tariffs that would equalize rates amongst all private line carriers other than its Long Lines Department.
 
 
 37
 On October 4, 1973, the FCC Chairman responded by issuing a letter order informing A T & T that it was required to submit the tariffs to the FCC, and not to the state regulatory commissions. With regard to interconnection, the FCC stated that the MCI and Specialized Common Carrier Services decisions directed A T & T to provide 'for interconnection facilities required by (specialized) carriers to terminate the services' authorized by the Commission. Furthermore, the Chairman wrote that:
 
 
 38
 '. . . It has been alleged that it has been the policy of the local companies of the Bell System not to furnish exchange facilities to specialized carriers or their customers for certain services which those carriers are authorized to provide and which would be in direct competition with services offered by A. T. & T. It is not at all clear from your letter that the proposed tariffs would remove this apparent discrimination as between the treatment of A. T. & T. services, on the one hand, and authorized services of the specialized carriers, on the other hand . . .. We are of the view that effective implementation of our policy objectives and the statutory scheme of the Communications Act require that you promptly file tariff schedules with this Commission in accordance with Section 203 of the Communications Act, which tariff schedules will provide the interconnection facilities essential to the rendition by the specialized carriers of all their authorized services on terms and conditions which are just, reasonable and non-discriminatory. Until such tariffs are filed and effective, there should be no delay in honoring requests of specialized carriers for interconection facilities requires by such carriers to terminate the services they are authorized by the Commission to furnish. Such facilities can be provided under contracts on an interim basis and we assume that this will be done.'
 
 
 39
 (A. 26-30).
 
 
 40
 MCI requested clarification of this order. On October 19, 1973, Bernard Strassburg informed MCI that the October 4th order contemplated A T & T's providing FX, CCSA, and other related services to the specialized carriers.[6] A T & T thereupon petitioned for review of the October 4th order before the Second Circuit.[7]
 
 
 41
 Buoyed by Mr. Strassburg's interpretation of the FCC's orders, MCI commenced an action (on November 2, 1973) in the District Court for the Eastern District of Pennsylvania to compel A T & T to provide FX, CCSA, and other related services. Jurisdiction was predicated upon 47 U.S.C. 406.[8] While the matter was pending before the district court, however, the Federal Communications Commission spoke again. On December 13, 1973, the agency released a memorandum opinion and order to show cause. See In the Matter of Bell System Tariff Offerings, 44 F.C.C.2d 245 (Docket No. 19896), modified 44 F.C.C.2d 914 (January 25, 1974). In its memorandum opinion, the FCC revealed that it had received requests for administrative action from A T & T (challenging the October 19, 1973 Strassburg letter) and from Western Union (seeking to prevent A T & T from proceeding before state regulatory bodies). Construing the requests as raising questions 'concerning the lawfulness of the actions taken by A T & T and the Bell System companies with respect to the provision of interconnection facilities . . .', the Commission designated March 4, 1974 for oral argument on these questions. In paragraph 19 of the opinion and order, the FCC declared that:
 
 
 42
 It is Further Ordered, That the parties shall address themselves to the questions of whether (1) the Commission has heretofore ordered the telephone companies, pursuant to Section 201(a) of the Communications Act, to provide interconnection with MCI or whether such interconnection is otherwise required pursuant to rule or regulation within the meaning of Section 312 of the Act; (2) if so, (a) the scope of that order or rule or regulation with particular reference to interconnection for FX and CCSA services of MCI; (b) whether the telephone companies have complied with such order, rule or regulation and, (c) if they have not complied, the appropriate remedy, whether under section 312 of the Act or otherwise; (3) if interconnection has not hitherto been ordered or required by rule or regulation whether it should be and if so, upon what terms and conditions; and (4) whether the Commission should affirm, reverse or modify the Staff action of October 19, 1973 for which review is here requested.
 
 
 43
 44 F.C.C.2d at 251-252.
 
 
 44
 Prior to the date of oral argument before the Commission, the district court issued an extensive memorandum opinion and order in the action commenced by MCI. See MCI Communications Corp. v. A. T. & T., 369 F.Supp. 1004 (E.D.Pa.1973). Inasmuch as 47 U.S.C. 406 (n.8, supra) is basically a mandamus statute, the district court was called upon to determine whether the FCC's prior orders had established a clear duty in A T & T to provide FX, CCSA and other related services. 369 F.Supp. at 1025. The court found that such a duty had been imposed and accordingly issued a preliminary injunction ordering A T & T to provide MCI with the subservices at issue. On appeal, however, this Court vacated the injunction.[9] The effect of our decision was to return to the FCC the responsibility for clarifying A T & T's duties to the specialized common carriers.
 
 
 45
 The FCC made its determination on April 23, 1974 in the decision and order now before us. (Docket No. 19896)[10] 46 F.C.C.2d 413. Reviewing the complete history as outlined above, the Commission made a dual announcement. First, it concluded that it had, in its prior actions, required A T & T to provide FX and CCSA services to MCI and other specialized common carriers on a nondiscriminatory basis (and under appropriate financial arrangements). Then, recognizing that its prior orders may not have been clear, the Commission reviewed the entire question of interconnection anew and concluded again that A T & T is required to provide such services on a non-discriminatory basis. In short, the FCC found:
 
 
 46
 . . . that our prior orders covered interconnection for the broad range of services which the specialized carriers are authorized to provide, and that Bell has been directed to furnish interconnection facilities for the purpose of enabling MCI and the other specialized carriers to provide all such services, including FX and CCSA type services. However, we recognize that our prior orders may not have been perfectly clear. In this proceeding, therefore, we are again reviewing the question of interconnection. We have given careful consideration to the arguments advanced by Bell in its briefs and at oral argument but . . . we are of the view that achievement of our objective that competition in the provision of interstate private line communication services be on a full, fair and nondiscriminatory basis requires the issuance of broad interconnection orders. Our orders herein therefore make clear that Bell is to provide interconnection facilities for all of the authorized services of the specialized carriers, including FX and CCSA.
 
 
 47
 46 F.C.C.2d at 426-427.
 
 
 48
 On the basis of this conclusion, the Commission issued orders (see Appendix) requiring A T & T to provide FX and CCSA to the specialized carriers on a nondiscriminatory basis.
 
 
 49
 In petitioning for review, A T & T assails the FX/CCSA orders in three regards. A T & T contends that the interconnection orders are invalid because: (1) the FCC did not conduct an evidentiary hearing, (2) the FCC utilized substantively infirm justifications in support of its orders, and (3) the FCC's mandate is expressed in overbroad terms. We shall evaluate these contentions in order.
 
 B. Nature of the Proceedings
 
 50
 We are unable to evaluate A T & T's contentions without first resolving a question that cuts across many of the issues facing this Court. A T & T asserts that the April 23rd orders (see Appendix) represent the first time in which the Commission, as a whole, required A T & T to provide FX and CCSA to the specialized carriers. A T & T views the prior (1971) proceeding-- Specialized Common Carrier Services (Docket 18920)[11] -- as requiring no more than the furnishing of 'local loops' (i.e., the interconnection of specialized carrier terminals with customer systems). See Petitioner's Brief at 35. Accordingly, in lodging its procedural and substantive attacks upon the April 23rd FX and CCSA orders, petitioner characterizes Docket 19896 as an independent proceeding. The Commission and several of the intervenors view Docket 19896 differently. According to the Commission, A T & T's responsibility to supply FX and CCSA was fixed by the Specialized Common Carrier Services decision (Docket 18920-1971). Respondent argues that the second proceeding (Docket 19896-1974) and the resultant orders merely represent the Commission's method of enforcing a previously announced mandate.
 
 
 51
 At first glance, A T & T's characterization of the proceedings appears to have merit. There is no mention of FX or CCSA in the Specialized Common Carrier Services decision. Instead, the Commission speaks only generally of 'private line services,' without reference to the components of such service. Nevertheless, upon closer examination, we are convinced that the Commission's decision in Docket 18920 includes a direction to the established carriers to provide FX and CCSA to the specialized carriers on a non-discriminatory basis. We base this conclusion upon a number of factors.
 
 
 52
 First, we reject the suggestion that Docket 18920 dealt only with 'local looping.'[12] In framing the issues for consideration, the Notice of Proposed Rule-Making identifies as separate matters the following issues:
 
 
 53
 A. Whether as a general policy the public interest would be served by permitting the entry of new carriers in the specialized communications field; and if so:
 
 
 54
 . . . . as
 
 
 55
 E. What is the appropriate means for local distribution of the proposed services? 24 F.C.C.2d at 327 (1970). In short, before reaching the issue of local distribution (issue 'E'), the Commission proposed to consider a more general topic: entry of new carriers into the private line service field.
 
 
 56
 Second, we note that in assessing the extent to which the established carriers' revenues might be diverted by competition from the specialized carriers, the FCC focused upon the total revenues earned by the established carriers in private line services.[13] We find this focus to be significant. Implicit in the FCC's evaluation is the assumption that the new entrants will provide services similar to those provided by the established carriers within the rubric of 'private line services.' As A T & T conceded in oral argument before this Court, it has traditionally provided FX and CCSA within its private line services.[14] It follows a fortiori that if the Commission contemplated the diversion of revenue attributable to A T & T's FX and CCSA services, the Commission must have assumed that FX and CCSA would be within the services provided by the specialized common carriers. See n.16, infra.
 
 
 57
 Third, in the same vein, we note the Commission's instruction that:
 
 
 58
 'we do contemplate full and fair competition in the specialized field among all carriers, both established and new . . ..'
 
 
 59
 29 F.C.C.2d at 916 (1971). Given this objective of full competition, it is difficult to understand why the Commission would authorize the new carriers to offer an incomplete 'package' of private lines services. In the absence of any suggestion to the contrary, we read the 'full competition' mandate as an indication that the Commission intended to authorize the new carriers to provide all elements of private line services theretofore furnished by the established carriers.
 
 
 60
 Finally, we are persuaded by the broad language utilized by the Commission in Docket 18920 (1971). Aside from its repeated use of the generic phrase 'private line service,' the FCC stated (in its conclusion with regard to issue 'E'):
 
 
 61
 We reaffirm the view expressed in the Notice (paragraph 67) that established carriers with exchange facilities should, upon request, permit interconnection or leased channel arrangements on reasonable terms and conditions to be negotiated with the new carriers, and also afford their customers the option of obtaining local distribution service under reasonable terms set forth in the tariff schedules of the local carrier. Moreover, as there stated, 'where a carrier has monopoly control over essential facilities we will not condone any policy or practice whereby such carrier would discriminate in favor of an affiliated carrier or show favoritism among competitors.' In view of the representations of A T & T and G T & E in this proceeding, upon which we rely, and the self-interest of other independent telephone companies in not losing potential new business, there appears to be no need to say more on this question at this time. Should any future problem arise, we will act expeditiously to take such measures as are necessary and appropriate in the public interest to implement and enforce the policies and objectives of this Decision.
 
 
 62
 29 F.C.C.2d at 940 (1971). We read this statement as extending beyond 'local loops,' incorporating a general direction to the established carriers to enable the new entrants to provide the variety of private line services furnished in the past by the established carriers.
 
 
 63
 A T & T contends that the FCC's decisions in Dockets 18920 and 19896, as well as this Court's recent opinion in MCI Communications Corp. v. A.T. & T., supra, belie the assertion that FX and CCSA were contemplated by the Specialized Common Carrier Services decision. First, A T & T asserts that in Docket 18920, the Commission assumed that it was encouraging the development of new types of services. Inasmuch as FX and CCSA were already provided by A T & T and by independent carriers, A T & T suggests that the Commission was contemplating other, more unique services, in Docket 18920. While there is language in Docket 18920 indicating a concern with new, customized services, we interpret this language as referring not only to the types of services provided, but also to the delivery of private line services to ultimate customers who theretofore had been unable to obtain private line services fashioned to their particular needs.[15] Second, A T & T asserts that in Docket 19896, the Commission conceded that it had not ordered the provision of FX and CCSA in its 1971 rulemaking proceeding. As discussed above (see p. 1259, supra), the Commission did admit in Docket 19896 that the scope of its prior orders may not have been 'perfectly clear' with regard to FX and CCSA. We treat this admission as the product of the agency's conservative approach in Docket 19896, in no way undermining the Commission's holding that Docket 18920 contemplated the provision of FX and CCSA.[16] Third, petitioner contends that our vacation of the affirmative injunction ordered by the district court in MCI Communications Corp. v. A. T. & T., supra, signifies disagreement with the district court's conclusion that Docket 18920 required A T & T to provide FX and CCSA to the specialized carriers. We reject any such reading of our opinion in MCI.[17] Inasmuch as jurisdiction was predicated upon a mandamus statute (47 U.S.C. 406), at issue in MCI was the question of whether or not A T & T had a clear and unequivocal duty to provide FX and CCSA (and other services) as a result of prior FCC orders. Since the issue is technical in nature, and since the Commission had announced that it was considering this precise question in its Docket 19896 proceedings, this Court held that the doctrine of primary jurisdiction precluded it from reaching the merits. See MCI Communications Corp. v. A. T. & T., supra, 496 F.2d at 223-224. We stated:
 
 
 64
 Under the facts of this case, we have concluded that the district court erred in not staying any action by it, at the least after December 13, 1973, until the FCC had had an opportunity to act on its above-mentioned proceeding at Docket No. 19896 where argument was scheduled for and held on March 4, 1974, particularly because until that proceeding is resolved defendants will not have the 'clear and unequivocal duties' referred to above . . ..
 
 
 65
 496 F.2d at 219-220. Contrary to petitioner's argument herein that this Court has already resolved the FX/CCSA dispute, we decided only that:
 
 
 66
 there was sufficient uncertainly concerning the existence and scope of % A t & t/'s obligation to provide interconnections into the switched network . . . that the district court should have deferred to the FCC in determining exactly what private line services had been authorized by the FCC.
 
 
 67
 496 F.2d at 222.
 
 
 68
 We thus are unpersuaded by petitioner's arguments with regard to the scope of the proceedings in Docket 18920. We conclude that Specialized Common Carrier Services created in A T & T a duty to provide the specialized carriers with FX and CCSA. Accordingly, as to FX and CCSA, we view Docket 19896 (the instant case) as a device for enforcing previously articulated responsibilities, and not as an independent proceeding.
 
 C. Evidentiary Hearing
 
 69
 At no time since the FCC's original MCI decision (see p. 1254, supra) has the Commission conducted an adjudicatory hearing with regard to the provision of private line services by the specialized common carriers. In Docket 18920 (Specialized Common Carrier Services), the FCC undertook to resolve basic policy issues through 'an overall policy and rule-making proceeding.'[18] Accordingly, the Commission restricted imput to (a) comments on issues raised in the Notice of Proposed Rule-Making, (b) oral argument, and (c) an opportunity to submit written rebuttal. Similarly, in the instant proceeding (Docket 19896), the parties did not enjoy an evidentiary hearing. Rather, they were limited to written comments (briefs) and one day of oral argument.
 
 
 70
 A T & T contends that the FX and CCSA orders on review herein are invalid in that they had not been preceded by an evidentiary hearing. Petitioner asserts that such a hearing is mandated by Section 201(a) of the Communications Act, 47 U.S.C. 201(a), which provides that:
 
 
 71
 (a) It shall be the duty of every common carrier engaged in interstate or foreign communication by wire or radio to furnish such communication service upon reasonable request therefor; and, in accordance with the orders of the Commission, in cases where the Commission, after opportunity for hearing, finds such action necessary or desirable in the public interest, to establish physical connections with other carriers, to establish through routes and charges applicable thereto and the divisions of such charges, and to establish and provide facilities and regulations for operating such through routes.
 
 
 72
 Petitioner's argument is actually two-fold: A T & T argues that an evidentiary hearing is required either solely as a matter of statutory construction (in effect, a per se rule) or as a result of the issues raised in the pleadings. We disagree.
 
 1. Per Se Statutory Construction
 
 73
 We find nothing in the text of 201(a) to indicate that interconnection orders must be preceded by an evidentiary hearing. The phrase 'opportunity for hearing' lacks the reference to a 'record' necessary to trigger the evidentiary requirements of the Administrative Procedure Act, 5 U.S.C. 551 et seq. See United States v. Florida East Coast Railway Co., 410 U.S. 224, 234, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973); United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 757, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972); Duquesne Light Co. v. Environmental Protection Agency, 481 F.2d 1, 6 (3d Cir. 1973). Indeed, the statutory phrase ('opportunity for hearing') is neutral: it no more requires an evidentiary hearing than does the equivocal phrase 'proceeding.' As the Supreme Court has recognized:
 
 
 74
 The term 'hearing' in its legal context undoubtedly has a host of meanings. Its meaning undoubtedly will vary, depending on whether it is used in the context of a rulemaking-type proceeding or in the context of a proceeding devoted to the adjudication of particular disputed facts.
 
 
 75
 United States v. Florida East Coast Railway Co., 410 U.S. at 239, 93 S.Ct. at 818.
 
 
 76
 A T & T does not offer legislative history to support its contention that the seemingly ambiguous phrase 'opportunity for hearing' mandates an evidentiary hearing. Instead, petitioner relies upon past practices of the Federal Communications Commission. While we recognize that the Commission has previously extolled the utilization of adjudicative hearings in 201 proceedings,[19] we do not believe that this 'prior practice' is as significant as is claimed by A T & T. The Commission's former policy of evaluating interconnection on a case-by-case basis was not predicated upon a belief that 201(a) required such a policy. Rather, it was developed as a matter of procedural policy, reflecting the Commission's view of the most efficacious and just method of administering interconnection petitions. In the absence of a statutory mandate, we see no reason to bind the Commission to this procedural policy. As technology develops and the field of communications changes, procedural, as well as substantive, policy must be flexible. The mere fact that an agency has once regarded evidentiary hearings as appropriate does not bar it from adopting another policy when changing or new circumstances require a different approach. See Phillips Petroleum Co. v. Federal Power Commission, 475 F.2d 842 (10th Cir. 1973), cert. denied, 414 U.S. 1146, 94 S.Ct. 901, 39 L.Ed.2d 102 (1974). Cf. Shapiro, The Choice of Rulemaking or Adjudication in the Development of Administrative Policy, 78 Harv.L.Rev. 921, 947-948 (1965). Accordingly, we do not regard the FCC's prior practice as dispositive of the type of 'hearing' required by 201(a).
 
 
 77
 We are persuaded instead that 201(a) should be interpreted to permit procedures less formal and adversarial than the evidentiary hearing demanded by A T & T. Three factors lead us to this conclusion. First, as the Supreme Court has suggested in FCC v. Pottsville Broadcasting Co.[20] and in In re Permian Basin Area Rate Cases,[21] procedural flexibility can aid the FCC in making the substantive determinations that it is required to make under the Communications Act. To lock the FCC into one type of proceeding-- be it evidentiary or otherwise-- could jeopardize the ability of the Commission to determine the 'public interest' in a given case. Second, we view the 'per se' rule advanced by A T & T as being contrary to legislative command. Congress has empowered the FCC to 'conduct its proceeding in such manner as will best conduce to the proper dispatch of business and to the ends of justice.' 47 U.S.C. 154(j). This direction leaves to the agency the determination of the type of procedure to be employed in a particular case. The per se approach suggested by A T & T is at odds with this flexible, discretionary standard. Third, we recognize that several courts have come to favor rule-making over adjudication for the formulation of new policy. See National Petroleum Refiners Association v. Federal Trade Commission, 157 U.S.App.D.C. 83, 482 F.2d 672, 681-683 (1973), cert. denied, 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974); WBEN, Inc. v. United States, 396 F.2d 601, 618 (2d Cir.), cert. denied, 393 U.S. 914, 89 S.Ct. 240, 21 L.Ed.2d 200 (1968); American Airlines, Inc. v. Civil Aeronautics Board, 123 U.S.App.D.C. 310, 359 F.2d 624, 630 (1966) (en banc); Long Island Railroad Co. v. United States, 318 F.Supp. 490, 496 (E.D.N.Y.1970) (three-judge court, per Judge Friendly). While there must be limits to this trend,[22] the rationale employed is logical and persuasive. Non-evidentiary rule-making permits broad participation in the decision-making process and enables an administrative agency to develop integrated plans in important policy areas. See generally Davis, Administrative Law Treatise, 6.15 (1970 Supp.); Shapiro, The Choice of Rulemaking or Adjudication in the Development of Administrative Policy, 78 Harv. L. Rev. at 930-942; Wright, The Courts and the Rulemaking Process: The Limits of Judicial Review, 59 Cornell L. Rev. 375, 376 (1974); see National Petroleum Refiners Association v. Federal Trade Commission, 482 F.2d at 678-684. Accordingly, we choose not to read into 201(a) a per se evidentiary hearing requirement in the absence of a clear statutory directive to conduct formal adjudicatory hearings.[23] We therefore reject A T & T's contention that 201(a) requires an evidentiary hearing as a condition precedent to all interconnection orders.
 
 
 78
 2. Relationship of the Issues to the Form of Hearing
 
 
 79
 Alternately, petitioner asserts that the nature of the issues before the Commission demand an evidentiary hearing in the instant case. Again, the argument is two-fold. A T & T contends that (1) the substantive significance of the policy issues and (2) the existence of genuine disputes with regard to material facts require the Commission to conduct an evidentiary hearing before ordering the established common carrier to provide FX and CCSA services to the specialized common carriers.
 
 
 80
 In evaluating these contentions, it is important to keep in mind the legal framework. As discussed above, we are dealing with a statute that does not mandate a particular form of proceeding for all cases. Instead, 201(a), as construed in conjunction with 154(j), leaves the choice of appropriate procedure to the FCC. In the absence of a per se statutory directive, the type of procedure chosen must be related to the kinds of issues involved. See Walter Holm & Co. v. Hardin, 145 U.S.App.D.C. 347, 449 F.2d 1009, 1015 (1971). As both petitioner and respondent have recognized, several 'rules of thumb' have developed to correlate procedures with particular types of cases. Nevertheless, the ultimate choice of procedure (in the absence of a statutory mandate) is left to the discretion of the agency involved, and will be reversed only for an abuse of discretion. See NLRB v. Bell Aerospace Co., Division of Textron, Inc., 416 U.S. at 290-295, 94 S.Ct. at 1770-1772, 40 L.Ed.2d 134 (1974); Security & Exchange Commission v. Chenery Corp., 332 U.S. 194, 203, 67 S.Ct. 1575, 9 L.Ed. 1995 (1947). Accordingly, we must determine whether the FCC abused its discretion in ordering the provision of FX and CCSA services without first conducting an evidentiary hearing.
 
 
 81
 A T & T argues that the scope, importance and complexity of the policy issues involved herein require an evidentiary hearing. Courts have, at times, indicated that evidentiary hearings are necessary to resolve issues of great substantive importance. See, e.g., Appalachian Power Co. v. Environmental Protection Agency, 477 F.2d 495, 501 (4th Cir. 1973); Marine Space Enclosures, Inc. v. Federal Maritime Commission, 137 U.S.App.D.C. 9, 420 F.2d 577, 585-586, n.22, 589, n.36 (1969); Citizens for Allegan County, Inc. v. Federal Power Commission, 134 U.S.App.D.C. 229, 414 F.2d 1125, 1128-1129 (1969). We decline to follow this line of cases.
 
 
 82
 When an administrative agency develops a general policy applicable on a prospective basis, courts have found it unnecessary to require evidentiary hearings, See, e.g., United States v. Florida East Coast Railway Co., 410 U.S. 224, 244-246, 93 S.Ct. 810, 36 L.Ed.2d 223 (1973); Duquesne Light Co. v. Environmental Protection Agency, 481 F.2d 1, 7 (3d Cir. 1973); International Harvester Co. v. Ruckelshaus, 155 U.S.App.D.C. 411, 478 F.2d 615, 630 (1973). This reluctance to prescribe evidentiary hearings on matters of general policy is grounded largely in practical considerations. Evidentiary hearings become 'totally unmanageable' when parties attempt to cross-examine the large numbers of persons normally interested in the development of policy. See, Virgin Islands Hotel Association v. Virgin Islands Water & Power Authority, 476 F.2d 1263, 1268 (3d Cir. 1973). As the Second Circuit has explained:
 
 
 83
 Adjudicatory hearings serve an important function when the agency bases its decision on the peculiar situation of individual parties who know more about this than anyone else. But when, as here, a new policy is based upon the general characteristics of an industry, rational decision is not furthered by requiring the agency to lose itself in an excursion into detail that too often obscures fundamental issues rather than clarifies them.
 
 
 84
 WBEN, Inc. v. United States, 396 F.2d 601, 618 (2d Cir.), cert. denied, 393 U.S. 914, 89 S.Ct. 240, 21 L.Ed.2d 200 (1968). Compare Bi-Metallic Investment Co. v. State Board of Equalization, 239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372 (1915) with Londoner v. Denver, 210 U.S. 373, 28 S.Ct. 708, 52 L.Ed. 1103 (1908).
 
 
 85
 We see no reason to depart from the doctrine articulated in Duquesne Light Co., Virgin Islands Hotel Association, and WBEN merely because the policy questions at issue are of special importance or complexity. Accord: National Air Carrier Association v. Civil Aeronautics Board, 141 U.S.App.D.C. 31, 436 F.2d 185, 194 (1970) ('The fact that these questions are difficult and important, however, does not mean that an evidentiary hearing is an essential prerequisite to their satisfactory resolution.'); cf. National Petroleum Refiners Association v. Federal Trade Commission, 482 F.2d at 683-684. A T & T has emphasized in the proceedings before this Court that the FCC's order to provide FX and CCSA services to specialized carriers represents a dramatic new development in communications policy. It is precisely in this type of action that the agency should be given the greatest degree of latitude in conducting proceedings consonant with the goals of efficient decision-making and responsible 'public interest' administration. Accordingly, we conclude that the mere significance and complexity of the policy issues before the FCC in Dockets 18920 and 19896 do not render the Commission's rejection of evidentiary hearings an abuse of discretion.[24]
 
 
 86
 A T & T, does, however, offer a second ground in support of its demand for an evidentiary hearing. Petitioner asserts that material factual issues exist and require adjudicatory proceedings. The factual issues relate primarily to the difficulties which A T & T anticipates upon interconnecting with the specialized carriers. In particular, A T & T contends that the Commission should have conducted evidentiary hearings to evaluate the established carriers' claims that interconnection (for FX and CCSA services) will: (1) impair the efficient operation of A T & T's switch network, (2) lead to substantial costs to the public, and (3) jeopardize the operation of all telephonic communications in the event of faulty performance in the specialized carriers' lines.
 
 
 87
 Generally, the existence of material factual issues requires an agency to conduct evidentiary hearings. See e.g., Air Line Pilots Association, International v. C.A.B., 154 U.S.App.D.C. 316, 475 F.2d 900, 904 (1973); Marine Space Enclosures, Inc. v. F.M.C., 137 U.S.App.D.C. 9, 420 F.2d 577, 589, n.36 (1969).[25] There are, however, important exceptions to this general rule. Professor Davis distinguishes between two types of factual disputes: those which can and those which cannot be 'decisively resolved' by evidentiary submissions. Davis, Administrative Law Treatise, 7.06 (1958 ed.). While those which can be decisively resolved ('adjudicative facts') should be subject to evidentiary hearings, those which do not lend themselves to evidentiary resolution ('legislative facts') obviously do not require adjudicatory proceedings. See SEC v. Frank, 388 F.2d 486, 491-492 (2d Cir. 1968); American Airlines, Inc. v. CAB, 123 U.S.App.D.C. 310, 359 F.2d 624, 633, cert. denied, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966); cf. Virgin Islands Hotel Association v. Virgin Islands Water & Power Authority, 476 F.2d 1263, 1268 (3d Cir. 1973).
 
 
 88
 We do not believe that the factual issues alleged by A T & T require an evidentiary hearing. Indeed, of all the parties to this dispute, A T & T stands in the best position to resolve these issues outside of an adjudicative forum. In submitting tariffs for the provision of FX and CCSA services to the specialized carriers, A T & T may require the specialized carriers to satisfy reasonable conditions for their use of A T & T's switched network. A T & T thus can protect itself against the technical difficulties which it has requested the Commission to evaluate. If the FCC believes that the tariffs ultimately filed result in too high a cost, the Commission has ample authority to suspend and review the tariffs. Given the nature of these issues, we hold that the Commission did not abuse its discretion in denying an adjudicatory 'airing' of the claims raised by A T & T.
 
 
 89
 In reaching this conclusion, we are especially mindful of the ultimate issue before us. We are not overly concerned with drawing a 'bright line' between adjudication and rule-making.[26] Regardless of the label and the procedure utilized, 'the ultimate standard against which we must evaluate the fairness of the proceedings is due process of law.' Hoffman-La Roche, Inc. v. Kleindienst, 478 F.2d 1, 12 (3d Cir. 1973). Upon our review of the record, we are convinced that the procedures utilized by the Commission pass constitutional muster. A T & T was given two separate opportunities (Dockets 18920 and 19896) to dissuade the FCC from ordering FX and CCSA interconnection. In both proceedings A T & T was given notice of the Commission's intentions[27] and was afforded the opportunity to present its arguments against the proposed interconnection. Inasmuch as petitioner can legitimately claim neither surprise nor denial of the opportunity to speak meaningfully to the issues before the Commission, we must reject the contention that A T & T was denied the 'opportunity for hearing' required by 201(a) and by due process of law.[28]
 
 
 90
 D. Substantive Validity of the FX and CCSA Orders
 
 
 91
 Petitioner contends that the FX and CCSA orders (see Appendix) are substantively invalid. In advancing this contention, A T & T argues first that the Commission was not entitled to rely upon Specialized Common Carrier Services (Docket 18920; 1971) to support its FX and CCSA orders. Second, it argues that the Commission has not yet found that FX and CCSA interconnection would be in the public interest. We hold both of these assertions to be without merit.
 
 
 92
 1. Specialized Common Carrier Services (Docket 18920; 1971)
 
 
 93
 Viewing Docket 19896 (1974) as an independent proceeding, and characterizing Specialized Common Carrier Services (Docket 18920; 1971) as unrelated to FX and CCSA, petitioner argues that the Commission's reliance in Docket 19896 upon the former proceeding invalidates the 1974 FX and CCSA order. We do not agree. Since we have found that Specialized Common Carrier Services (Docket 18920; 1971) contemplated the provision of FX and CCSA services,[29] there can be no error in the FCC's relying upon this decision in forcing its previously announced mandate.
 
 
 94
 As an alternate argument, A T & T argues that even if the Commission did order FX and CCSA interconnection in Docket 18920 (1971), the failure to notify A T & T in advance of the Commission's intention to include FX and CCSA interconnection within the rule-making proceeding precludes subsequent reliance in Docket 19896 upon Docket 18920. The Notice of Proposed Rulemaking in Docket 18920 (24 F.C.C.2d 318) belies this contention. Although the Commission speaks in general terms in the Notice, we conclude that the general references to private line services were sufficient to give A T & T the requisite notice as to FX and CCSA services. In support of this conclusion, we note that the Commission's staff analysis, reproduced in the Notice (in Docket 18920), analyzed 'diversion' as follows:
 
 
 95
 It is important to recognize that we are concerned with only a relatively small percentage of established common carrier service to the public. For example, A T & T's present interstate business constitutes only about 30 percent of the Bell System's total business; about 87 percent of the interstate revenue is from message toll telephone and wide area telephone service (WATS), and these latter services have an annual growth rate of about 15 percent. None of the applicants proposes to provide this type of service and we see no reason to expect any undesirable effects upon these services. An examination of A T & T's private line program transmission and other more specialized services indicates that an estimate of the proportion of A T & T services that is vulnerable to competitive inroads would be on the order of 2-4 percent of its existing total business.
 
 
 96
 24 F.C.C.2d at 335. Simple mathematics indicates that this '2-4 percent of (A T & T's) existing total business' represents all interstate revenue earned from sources other than message toll telephone and wide area telephone services. This 2-4 percent must perforce include A T & T's revenue derived from interstate FX and CCSA services. The Commission's analysis, and its reference to these percentages, demonstrates that the Commission was contemplating the provision of FX and CCSA services by the specialized carriers. In further support of our conclusion, we also note that the FCC, in discussing local loop service, spoke expansively of the duty of the established carriers:
 
 
 97
 In the MCI case, the Commission retained jurisdiction over the interconnection issue, stating that an order requiring the established carriers to provide loop service would be issued unless it is shown that interconnection is not technically feasible (18 FCC2d at 965; 21 FCC2d at 193). The local exchange facilities of the Bell System and independent telephone companies presently constitute almost the sole means for local distribution of interstate common carrier services (apart from CATV and broadcast facilities). Western Union is almost entirely dependent on the Bell System for its local distribution. If access to local facilities is requested and needed by the applicants, we would expect the local carrier-- Bell or other carrier-- to permit interconnection or leased channel arrangements on reasonable terms and conditions to be negotiated with the new carriers. In other words where a carrier has monopoly control over essential facilities we will not condone any policy or practice whereby by such carrier would discriminate in favor of an affiliated carrier or show favoritism among competitors. Customers of any new carrier should also be afforded the option by the local carrier to obtain local distribution facilities under reasonable terms set forth in the tariff schedules of the latter.
 
 
 98
 24 F.C.C.2d at 347. If this passage connotes nothing else, it indicates that the Commission intended the established carriers to provide to the specialized carriers the same services (at the same rates) as those provided to A T & T's affiliates. As A T & T had long provided FX and CCSA interconnection to its affiliates, it should have recognized that the Commission would order the furnishing of these services on a nondiscriminatory basis. Accordingly, we reject the alternate contention that A T & T did not receive the requisite notice in Docket 18920 (1971).
 
 
 99
 We therefore conclude that the Commission was fully justified in relying upon Specialized Common Carrier Services (Docket 18920; 1971) in the instant (enforcement) proceeding.
 
 2. Public Interest Findings
 
 100
 Section 201(a) of the Communications Act requires (as a condition precedent to the issuance of interconnection orders) that the FCC make a finding that the proposed interconnection will be 'necessary or desirable in the public interest.' A T & T suggests that the FX and CCSA orders contravene this statutory directive, asserting: (1) that the FCC has never determined that the furnishing of FX and CCSA services to the specialized common carriers would be in the public interest, (2) that even if such a finding were made, its reliance upon competition contravenes FCC v. RCA Communications, Inc.[30] and Hawaiian Telephone Co. v. FCC,[31] and (3) that even if such a finding were made and was not violative of RCA and Hawaiian Telephone, the failure of the Commission to indicate its rationale vitiates the required public interest finding.
 
 
 101
 A T & T's first and third assertions are undermined by Specialized Common Carrier Services (Docket 18920). The primary issue considered by the FCC in Docket 18920 was whether as a matter of policy, it was in the public interest to permit 'the entry of new carriers in the specialized communications field.' 29 F.C.C.2d at 878. As we have previously discussed, the Commission focused upon the full field of private line services theretofore provided by the established carriers. The Commission's evaluation demonstrated that the public interest favored the entry of specialized carriers into the full field of private line services. After analyzing its staff's conclusions with regard to the nature of the market, the public's demand for specialized services, the benefits to be expected from new entry, and the likely impact upon the established carriers, the Commission held as follows:
 
 
 102
 We find that: there is a public need and demand for the proposed facilities and services and for new and diverse sources of supply, competition in the specialized communications field is reasonably feasible, there are grounds for a reasonable expectation that new entry will have some beneficial effects, and there is no reason to anticipate that new entry would have any adverse impact on service to the public by exisiting carriers such as to out-weigh the considerations supporting new entry. We further find and conclude that a general policy in favor of the entry of new carriers in the specialized communications field would serve the public interest, convenience, and necessity.
 
 
 103
 29 F.C.C.2d at 920. Although the Commission does not mention FX and CCSA by name, we regard the above holding as including an amply-supported finding that the public interest favors the furnishing of FX and CCSA interconnection to the specialized carriers.
 
 
 104
 A T & T's attempt to invoke FCC v. RCA Communications, Inc., supra, is similarly without merit. In RCA, the FCC had authorized the opening of new circuits because of 'the national policy in favor of competition.' 346 U.S. at 89, 73 S.Ct. at 1001. The Supreme Court vacated the agency's order, concluding that the FCC may not authorize new circuits merely in order to foster competition. The Court held that for the FCC to perform its statutory responsibilities, it must at least relate competition to the public interest. In the course of criticizing the Commission for relying solely upon competition, the Court explained that competition could be considered as a 'relevant factor in weighing the public interest.' 346 U.S. at 94, 73 S.Ct. at 1004. Indeed, Justice Frankfurter explained at great length the extent to which the FCC could consider competition in evaluating the 'public interest.' He stated:
 
 
 105
 We think it not inadmissible for the Commission, when it makes manifest that in so doing it is conscientiously exercising the discretion given it by Congress, to reach a conclusion whereby (license) authorizations would be granted wherever competition is reasonably feasible . . .. In reaching a conclusion that duplicating authorizations are in the public interest wherever competition is reasonably feasible, the Commission is not required to make specific findings of tangible benefit. It is not required to grant authorizations only if there is a demonstration of facts indicating immediate benefit to the public. To restrict the Commission's action to cases in which tangible evidence appropriate for judicial determination is available would disregard a major reason for the creation of administrative agencies, better equipped as they are for weighing intangibles 'by specialization, by insight gained through experience, and by more flexible procedure.' Far East Conf. v. United States, 342 U.S. 570, 575 (72 S.Ct. 492, 494, 96 L.Ed. 576). In the nature of things, the possible benefits of competition do not lend themselves to detailed forecast, cf. (National) Labor (Relations) Board v. Seven-Up Co., 344 U.S. 344, 348, (73 S.Ct. 287, 289, 97 L.Ed. 377), but the Commission must at least warrant, as it were, that competition would serve some beneficial purpose such as maintaining good service and improving it. (D.C.Cir. 1974). also Hawaiian Telephone Co. v. FCC, (D.Cir. 1974).
 
 
 106
 Specialized Common Carrier Services (Docket 18920) fully comports with the principles articulated in RCA. First, the Commission relied upon factors other than competition in making its public interest determination. Specifically, the FCC noted that (1) the specialized communications market is expanding, and that (2) the demand for specialized communications service is growing. 29 F.C.C.2d at 904-908. Second, following Justice Frankfurter's lead, the Commission concluded and warranted that benefits were reasonably to be anticipated as a result of the entry of new specialized carriers into the market. Quoting from the Notice of Proposed Rule-Making, the FCC identified the following benefits:
 
 
 107
 (1) By permitting the entry of specialized carriers, we would provide users with flexibility and a wider range of choices as to how they may best satisfy their expanding and changing requirements for specialized communication service (Notice, paragraph 30).
 
 
 108
 (2) There is also a question as to whether the existing carriers can meet the requirements in the specialized markets promptly, efficiently and effectively without prejudice to full and timely satisfaction of the increasing requirements of the public monopoly services. The responsibility for meeting the nation's growing and changing communications requirements is now largely concentrated in the Bell System. This responsibility is becoming more and more difficult to discharge in a manner which enables the Bell System to satisfy timely and effectively all existing and anticipated communications requirements. This is partly because of the diversity of such requirements, the obvious problems of designing and engineering facilities capable of meeting all such requirements with equal efficiency, economy and expedition, and the huge and increasing amounts of new capital the Bell System must raise for construction purposes. The entry of new carriers would have the effect of dispersing somewhat the burdens, risks and initiatives involved in supplying the rapidly growing markets for new and specialized services among a multiplicity of entrepreneurs who appear ready, willing and able to assume these undertakings. It would also expand the capability of the communications industry to respond to the challenge of meeting the rapidly growing and varied demands of communications users (Notice, paragraph 32).
 
 
 109
 (3) Further, while economies of scale may result when large general purpose transmission facilities can be used to meet relatively homogeneous communications requirements, there may be other drawbacks. The sheer size of the A T & T organizational structure, its enormous financing requirements, its vertical integration, and near monopoly position in the provision of communications services may make it slower to perceive and respond to individual, specialized requirements and to initiate market and technical innovations. Competition in the specialized communications field would enlarge the equipment market for manufacturers other than Western Electric, and may stimulate technical innovation and the introduction of new techniques. Moreover, new carriers with smaller scale operations could devote their undivided attention to the particular needs to be served and, lacking a captive market, would be under pressure to innovate to produce those types of services which would attract and retain customers (Notice, paragraph 34).
 
 
 110
 (4) In an industry of the size and growing complexity of the communications common carrier industry, the entry of new carriers could provide a useful regulatory tool which would assist in achieving the stautory objective of adequate and efficient services at reasonable charges. Competition could afford some standard for comparing the performance of one carrier with another. Moreover, competitive pressure may encourage beneficial changes in A T & T's services and charges in the specialized field, and stimulate counter innovation or the more rapid introduction of new technology (Notice paragraph 35).
 
 
 111
 29 F.C.C.2d at 909-910. We regard the listing of factors (independent of competition) and the identification of benefits (reasonably expected) as proof that the FCC viewed competition as a means, rather than as a goal in and of itself, in Docket 18920. Accordingly, we reject petitioner's RCA contention and hold that the FCC has made the requisite 'public interest' findings.
 
 E. Overbreadth
 
 112
 It is undisputed that the FCC has the responsibility to articulate its orders in clear and precise terms, avoiding reasonable doubts as to their ultimate meaning. See FTC v. Broch & Co., 368 U.S. 360, 367-368, 82 S.Ct. 431, 7 L.Ed.2d 353 (1962); FTC v. Cement Institute, 333 U.S. 683, 726, 68 S.Ct. 793, 92 L.Ed. 1010 (1948). A T & T contends that the Commission has not fulfilled this responsibility in the instant case.31A Specifically, A T & T asserts that in requiring it to permit any physical connections 'essential' to the rendition of 'all' private lines services which any of the specialized carriers 'presently or hereafter' are authorized to offer (see Appendix, P53a), the Commission has imposed an unbounded interconnection order. A similar objection is lodged against the agency's order to cease and desist from engaging in 'any conduct' which will result in a delay or denial of services 'presently or hereafter' authorized (see Appendix, P54a).
 
 
 113
 Were we to read the Commission's order in a vacuum, we would be inclined to agree with petitioner that the order is somewhat vague and, to a certain extent, overbroad. On its face, the order gives little guidance as to the types of services that A T & T will be required to provide 'hereafter.'
 
 
 114
 Nevertheless, we find it unnecessary to remand on this ground. Orders are not to be read in a vacuum, but rather must be read and interpreted in the context in which they appear. See FTC v. Cement Institute, 333 U.S. at 729, 68 S.Ct. 793. Viewed in its entirety, the FCC's opinion in Docket 19896 operates to preclude A T & T from treating its Long Lines Department and its affiliates differently than it treats the specialized common carriers. The Commission noted that in previous proceedings, 'our action was taken to insure that competition in the provision of interstate private line communications would be on a full, fair, and non-discriminatory basis . . ..' 46 F.C.C.2d at 426. Similarly, the FCC identified as its primary objective in Docket 19896 a communications market in which private line services are provided on a 'full, fair, and non-discriminatory basis.' 46 F.C.C.2d at 427. Given this concern with non-discriminatory treatment, the FCC's order takes on a definite meaning. As we read the order, the FCC has required A T & T to provide to the specialized carriers those (interconnection) elements of private line services which A T & T supplies to its affiliates and furnishes to customers through its Long Lines Department. We believe that such an order is authorized by 47 U.S.C. 201(a) and is supported by the Commission's opinion in Docket 19896.
 
 
 115
 Accordingly, we reject A T & T's contention that the order herein is impermissibly sweeping, undefined and unsupported.
 
 II. Western Union Contracts
 A. Background
 
 116
 At least since 1928, Western Union has leased local distribution facilities from A T & T pursuant to privately negotiated 'exchange of facilities' contracts.[32] These contracts are indefinite in term, but provide that either party may terminate upon five years' notice. In September of 1973, A T & T gave notice of its intention to terminate the contracts. Rather than honor such contracts until 1978, however, A T & T attempted to rescind the contracts at once by filing what it hoped would be superseding tariffs.[33] At first, A T & T filed these tariffs with various state regulatory commissions, but, upon FCC order, A T & T also filed the tariffs with the FCC, albeit under protest.
 
 
 117
 On November 1, 1973, Western Union complained to the FCC, charging that A T & T's tariff practices were unlawful and incapable of superseding the privately negotiated contracts between A T & T and the complainant. The FCC responded to this complaint in its December 13th memorandum opinion and order to show cause.[34] Bell System Tariff Offerings, 44 F.C.C.2d 245 (1973), modified, 44 F.C.C.2d 912 (1974) (Docket 19896). In its December 13th opinion, the Commission, after noting that the tariffs and contracts might not be mutually exclusive, ordered A T & T to abide by the contract rates pending the Commission's decision as to whether the contracts could lawfully be superseded by a subsequent tariff filing. Furthermore, A T & T was ordered to show cause why it should not cease and desist from:
 
 
 118
 (a) altering, in any way, the provisions of exchange facilities contracts with Western Union, except in strict accordance with the terms of such contracts . . ..
 
 
 119
 44 F.C.C.2d at 251.
 
 
 120
 A T & T's responses were insufficient to convince the Commission. Relying upon Supreme Court decisions construing the National Gas Act and the Federal Power Act, the FCC concluded (in its opinion released on April 23, 1974) that 'Bell cannot supersede, modify, or terminate its contracts with Western Union merely by filing tariffs or taking other unilateral action.' 46 F.C.C.2d at 432. The Commission therefore rejected the A T & T tariffs to the extent that the tariffs applied to interconnection facilities and services covered by the privately negotiated contracts.[35] A T & T petitions for review.
 
 B. The Conflicting Precedents
 
 121
 Both before the Commission and before this Court, petitioner and Western Union (as an intervenor) have relied upon seemingly inconsistent case law. A T & T placed primary reliance upon Armour Packing Co. v. United States[36] to demonstrate that its tariffs may lawfully supersede previously negotiated contracts. Western Union, in response, cites United Gas Co. v. Mobile Gas Corp.[37] and Federal Power Commission v. Sierra Pacific Power Co.,[38] to support the FCC's rejection of the tariffs.
 
 
 122
 In Armour, the question arose as to whether a tariff could supersede a contract entered into between a railroad and a shipper (i.e., a customer). The Court found that the tariff applied, noting that the purpose of the law (i.e. the Interstate Commerce Act) 'is to require all shippers to be treated alike, and but one rate to be charged for similar carriage of freight, and that the field and published rate (be) equally known by and available to every shipper.' 209 U.S. at 80, 28 S.Ct. at 435.
 
 
 123
 A contrary result was reached by the Supreme Court in United Gas Co. v. Mobile Gas Corp., supra. Construing the Natural Gas Act,[39] the Court held that a gas company could not unilaterally alter a contract with a distributing company by filing a new tariff with the Federal Power Commission. The Court's holding was premised upon the principle that unilateral modification would be permissible only if authorized by the contract in question or by the Natural Gas Act. After finding that the contract was silent on this issue, the Court analyzed the structure of the Gas Act. Recognizing that the Gas Act requires gas companies to file all contracts with the FPC and authorizes the FPC to modify unreasonable contracts, the Court construed the Act to permit '. . . the relations between the parties to be established initially by contract, the protection of the public interest being afforded by supervision of the individual contracts, which to that end must be filed with the Commission and made public.' 350 U.S. at 339, 76 S.Ct. at 378. Given this scheme, the Court concluded that 'there is nothing in the structure or purpose of the Act from which we can infer the right, not otherwise possessed and nowhere expressly given by the Act, of natural gas companies unilaterally to change their contracts.' 350 U.S. at 343-344, 76 S.Ct. at 380. The Court reached a similar result with regard to the Federal Power Act[40] in FPC v. Sierra Pacific Power Co., supra.
 
 
 124
 While Armour and Mobile appear at first blush to be wholly inconsistent, they are distinguishable. In Armour, the Court emphasized the fact that the Interstate Commerce Act prescribes uniform rates for shippers[41] and therefore cannot permit rates to be set haphazardly by contract. The regulatory statutes confronting the Court in Mobile and Sierra Pacific are different: uniform rates are not prescribed. Unlike the Interstate Commerce Act, the Natural Gas Act and the Federal Power Act permit rates to be set by contract. Justice Harlan, writing for a unanimous Court in Mobile, recognized this very distinction. He wrote:
 
 
 125
 The prior decisions of this Court cited by petitioners as requiring an opposite result are readily distinguishable. In Armour Packing Co. v. United States, 209 U.S. 56 (28 S.Ct. 428, 52 L.Ed. 681), a rate contract between a railroad and a shipper at the field rates in effect at the time the contract was made was held not to justify payment at the contract rate for shipments made after the filed rates for shipments of that character had been increased by the railroad. The very basis for that decision, however, was the requirement of the Interstate Commerce Act that rates to all shippers be uniform and comply with the single tariff filed with the Commission, there being no provision under that Act for the filing of individual contracts. That is, the Interstate Commerce Act by its own force precluded contracts for rates different from those applicable to other shippers. The Natural Gas Act, on the other hand, recognizes the need for private contracts of varying terms and expressly provides for the filing of such contracts as a part of the rate schedules. No contention is made here that the fact that the Mobile contract was at a rate different from that to other customers in itself made the contract illegal or that-- as held in Armour-- United could not lawfully have complied with the contract had it wanted to.
 
 
 126
 350 U.S. at 345, 76 S.Ct. at 381. The problem raised by the instant case thus lies not in reconciling Armour and Mobile, but rather in determining which precedent should stand as a model to resolve the controversy between Western Union and A T & T.
 
 C. The Instant Case
 
 127
 In urging this Court to adopt Armour, A T & T emphasizes the fact that the Communications Act was patterned upon the Interstate Commerce Act.[42] Without questioning this legislative history, we nevertheless are compelled to find that the instant case and Armour are distinguishable. As discussed above, the holding in Armour that a tariff could supersede a contract was predicated upon the fact that the Interstate Commerce Act does not envision that shippers' rates will be set by contract. While communications carriers may similarly be prohibited from contracting with customer-users, we find no such directive barring contractual relations between independent carriers.
 
 
 128
 Indeed, our analysis of the Communications Act leads us to the conclusion that the A T & T-- Western Union contracts (unlike the carrier-shipper contract in Armour) represent a legitimate method of ordering business relations under Congress' regulatory legislation. Section 203(c) of the Act provides that:
 
 
 129
 No carrier, unless otherwise provided by or under authority of this chapter, shall engage or participate in such communication unless schedules have been filed and published in accordance with the provisions of this chapter and with the regulations made thereunder; and no carrier shall (1) charge, demand, collect, or receive a greater or less or different compensation for such communication, or for any service in connection therewith, between the points named in any such schedule than the charges specified in the schedule then in effect, or (2) refund or remit by any means or device any portion of the charges so specified, or (3) extend to any person any privileges or facilities in such communication, or employ or enforce any classifications, regulations, or practices affecting such charges, except as specified in such schedule.
 
 
 130
 47 U.S.C. 203(c). The caveat in the above provision is critical: carriers must operate by tariff unless otherwise authorized by the Act. Such authorization is clearly found in Section 201(b) of the Act, which provides in part, that:
 
 
 131
 . . . Nothing in this chapter or in any other provision of law shall be construed to prevent a common carrier subject to this chapter from entering into or operating under any contract with any common carrier not subject to this chapter, for the exchange of their services, if the Commission is of the opinion that such contract is not contrary to the public interest . . ..
 
 
 132
 47 U.S.C. 201(b). In the instant case, 201(b) is of course not dispositive, since both A T & T and Western Union are carriers 'subject to this chapter.' Nevertheless, when viewed with still another provision of the Act, 201(b) takes on some importance. Section 211(a) of the Communications Act provides that:
 
 
 133
 Every carrier subject to this chapter shall file with the Commission copies of all contracts, agreements, or arrangements with other carriers, or with common carriers not subject to the provisions of this chapter, in relation to any traffic affected by the provisions of this chapter to which it may be a party.
 
 
 134
 47 U.S.C. 211(a). While 201(b) speaks only of contracts between a regulated and a non-regulated carrier, section 211(a) goes beyond that limited class. Section 211(a) requires the filing of two classes of contracts: contracts between two or more (regulated) carriers and contracts involving a regulated carrier and a non-regulated carrier. We read 211(a) as providing another exception to the general rule of 203(b): carriers regulated by the Act may order their business relations by contract as well as by tariff.
 
 
 135
 A T & T concedes that 211(a) does allow some private-ordering-by-contract as between carriers regulated by the Act. (Petitioner's Brief at 54). However, A T & T contends that its leasing contracts are not of the type described in 211(a).[43] In support, A T & T points to a Regulation identifying types of contracts contemplated by 201(a) and argues that a leasing contract is not included. This Regulation provides:
 
 
 136
 (a) Each communication common carrier shall file with the Commission, within thirty (30) days of execution (or within 30 days of a carrier first becoming subject to the provisions of this section), a copy of each contract, agreement, concession, license, authorization, or other arrangement to which it is a party with respect to communication traffic affected by the Communications Act of 1934, as amended, relating to the following:
 
 
 137
 (1) The exchange of services between such carrier and any carrier not subject to the act;
 
 
 138
 (2) Except as provided in paragraph (e) of this section, the interchange or routing of traffic and matters concerning rates, division of tolls, or the basis of settlement of traffic balances; or
 
 
 139
 (3) Rights granted to the carrier by any foreign government for the landing, connection, installation, or operation of cables, land lines, radio stations, offices, or for otherwise engaging in communication operations.
 
 
 140
 (b) Except as provided in paragraph (e) of this section, a copy of each modification, amendment, or cancellation of any instrument required to be filed under the provisions of paragraph (a) of this section shall likewise be filed within thirty (30) days after execution.
 
 
 141
 (c) Except as provided in paragraph (e) of this section, if any contract, agreement, concession, license, authorization, or other arrangement, or change therein, as contemplated in paragraphs (a) and (b) of this section, is made other than in writing a certified statement covering all details thereof shall be filed within thirty (30) days from the date it is made.
 
 
 142
 (d) Except as provided in paragraph (e) of this section, upon the filing of any item required by paragraphs (a) to (c) of this section by one or two or more carriers subject to these provisions, each other party to the agreement may, in lieu of also filing a copy thereof, file a certified statement appropriately identifying the document and concurring in the contents thereof, as filed.
 
 
 143
 (e) With respect to contracts coming within the scope of paragraph (a) (2) of this section between subject telephone carriers and connecting carriers, except for those which relate to communications with foreign or overseas points, such contracts shall not be filed with the Commission; but each subject telephone carrier shall maintain a copy of such contracts to which it is a party in appropriate files at a central location upon its premises, copies of which contracts shall be readily accessible to Commission staff and members of the public upon reasonable request therefor; and upon request by the Commission, a subject telephone carrier shall promptly forward individual contracts to the Commission.
 
 
 144
 47 C.F.R. 43.51.
 
 
 145
 We are unpersuaded by A T & T's argument. Contrary to petitioner's position, it may well be that the Western Union contracts fit within 47 C.F.R. 43.51(a) (2), since the contracts do establish rental rates. Of more importance, there is nothing in the above Regulation indicating that it contains an exclusive list of all the various types of contracts contemplated by 211(a). The statute itself suggests no such limited interpretation; section 211(a) is written in terms of 'all' contracts. The legislative history, too, indicates that Congress intended all intercarrier contracts to be filed with the Commission. In explaining the various sections of the Communications Act, a House Committee wrote:
 
 
 146
 Section 211(a) requires filing of all contracts between carriers engaged in the communications business and between communication companies and other common carriers not covered by this bill.
 
 
 147
 H.R.No.1850, 73d Cong., 2d Sess. at 6 (1934). We conclude that section 211(a) requires the filing of contracts such as the A T & T-- Western Union contracts at issue. It follows from this conclusion that the Act permits A T & T and Western Union to provide for the leasing of facilities by contract, as well as by tariff.[44] See United Gas Co. v. Mobile Gas Corp., 350 U.S. at 338, 76 S.Ct. at 378 ('by requiring contracts to be filed with the Commission, the (Natural Gas) Act expressly recognizes that rates to particular customers may be set by individual contracts.'). Armour is therefore distinguishable.
 
 
 148
 Mobile, too, is distinguishable. In reaching its conclusion that the Natural Gas Act did not authorize the unilateral supersession of contracts by tariffs, the Supreme Court emphasized the fact that the Natural Gas Act empowers the FPC to regulate privately-negotiated contracts.[45] The Court justified the Natural Gas Act's reliance upon individualized contracts in terms of this power, stating that 'the Natural Gas Act permits the relations between the parties to be established initially by contract, the protection of the public interest being afforded by supervision of the individual contracts, which to that end must be filed with the Commission and made public.' 350 U.S. at 339, 76 S.Ct. at 378. Similarly, the Court noted:
 
 
 149
 Our conclusion that the Natural Gas Act does not empower natural gas companies unilaterally to change their contracts fully promotes the purposes of the Act. By preserving the integrity of contracts, it permits the stability of supply arrangements which all agree is essential to the health of the natural gas industry . . .. On the other hand, denying to natural gas companies the power unilaterally to change their contracts in no way impairs the regulatory powers of the Commission, for the contracts remain fully subject to the paramount power of the Commission to modify them when necessary in the public interest. The Act thus affords a reasonable accommodation commodation between the conflicting interests of contract stability on the one hand and public regulation on the other.
 
 
 150
 350 U.S. at 344, 76 S.Ct. at 380. A similar justification is not available under the Communications Act. Unlike the Natural Gas Act, there is no provision in the Communications Act expressly authorizing the Commission to regulate (i.e. supervise in the public interest) privately negotiated contracts.
 
 
 151
 In Docket 19896, after conceding that the Act does not expressly grant the Commission contract-regulating powers, the FCC concluded that implicit in several sections of the Act is the recognition of such a power. Petitioner strongly contests this point, arguing that if the Commission were so empowered, the FCC would not have attempted (as it did in 1964) to persuade Congress to vest authority in it to regulate intercarrier contracts. See Hearings on H.R. 10270 before the Committee on Interstate and Foreign Commerce, U.S. House of Representatives, 88th Cong., 2d Sess. at 9-10, 24, 39 (1964); but cf. United States v. Southwestern Cable Co., 392 U.S. 157, 169-170, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968). We find it unnecessary to resolve this controversy.
 
 
 152
 Although Mobile is distinguishable, the Supreme Court's analysis therein nevertheless causes us to reject A T & T's argument, even if we assume that the Commission lacks regulatory power over intercarrier contracts. The Mobile Court reached its conclusion by the following deductive path:
 
 
 153
 a) the Natural Gas Act permits parties to order their business relations by contract (i.e., the contract at issue was lawful);[46] b) since the contract at issue does not authorize its own unilateral modification, supersession of the contract by a unilaterally imposed tariff can only occur if the Natural Gas Act grants such a power;[47] and c) the provisions of the Natural Gas Act do not grant gas companies the power to unilaterally modify contracts.[48]
 
 
 154
 We have already determined that the Communications Act permits Western Union and A T & T to arrange leases by contract. There being no suggestion that the A T & T-- Western Union contracts authorize unilateral modification, the sole question remaining for this Court, according to the Mobile analysis, is whether the Communications Act supplies this authorization.
 
 
 155
 We have recognized that 'a statute should not be considered in derogation of the common law unless it expressly so states or the result is imperatively required from the nature of the enactment.' Bauers v. Heisel,361 F.2d 581, 587 (3d Cir. 1966) (en banc), cert. denied, 386 U.S. 1021, 87 S.Ct. 1367, 18 L.Ed.2d 457 (1967); see also Texas & Pacific Ry. v. Abilene Cotton Oil Co., 204 U.S. 426, 437, 27 S.Ct. 350, 354, 51 L.Ed. 553 (1907) ('. . . a statute will not be construed as taking away a commonlaw right existing at the date of its enactment, unless that result is imperatively required; that is to say, unless it be found that the pre-existing right is so repugnant to the statute that the survival of such right would in effect deprive the subsequent statute of its efficacy; in other words, render its provisions nugatory.') The Communications Act contains no express statement of an intention to authorize unilateral modification or abrogation of privately negotiated contracts. Nor do the various provisions of the Act 'imperatively require' that we imply such authorization. The two sections of the statute coming closest to authorizing a unilateral change-- sections 203(b)[49] and 204[50] -- are insufficient, even in their combined effect, to convince us that the FCC has the power to authorize the unilateral changes attempted by A T & T. Section 203(b), prohibiting tariff modifications unless ample notice is given to the Commission, takes away power from communications carriers. As a negative pronouncement, 203(b) in no sense dictates circumstances in which a tariff could be used to abrogate a prior contract. In Mobile, the Supreme Court explained that a parallel provision of the Natural Gas Act[51] similarly did not constitute an affirmative grant of power. The Court stated:
 
 
 156
 It is argued that (Section 4(d)) authorizes a natural gas company to change its rates contracts simply by filing a new schedule of rates, to go into effect in no less than thirty days. On its face, however, 4(d) is simply a prohibition, not a grant of power. It does not purport to say what is effective to change a contract . . .. The section says only that a change cannot be made without the proper notice to the Commission; it does not say under what circumstances a change can be made . . .. In short, 4(d) on its face indicates no more than that otherwise valid changes cannot be put into effect without giving the required notice to the Commission. To find in that section a further purpose to empower natural gas companies to change their contracts unilaterally requires reading into it language that is neither there nor reasonably to be implied.
 
 
 157
 350 U.S. at 339-340, 76 S.Ct. at 378. Section 204, establishing the procedure for FCC review of newly filed tariffs (and including an authorization for temporary suspensions of tariffs), similarly is silent about the utilization of tariffs to modify existing contracts. We find neither in this section nor in any other provision of the Act an indication that Congress intended to allow carriers to abrogate intercarrier contracts by means of subsequently filed tariffs.
 
 
 158
 The cases cited by petitioner do not detract from our conclusion that the Communications Act lacks an authorization of unilateral contract modification. Cruces Cable Co., 35 F.C.C.2d 707 (1972), reconsideration denied, 39 F.C.C.2d 552 (1973) is distinguishable. Although in Cruces the Commission did indicate that a communications carrier may unilaterally abrogate a contract by filing a tariff, the contract in Cruces was wholly unlike the contracts involved herein. In Cruces, the contract contained no specific rate, but rather provided that the tariffs 'shall be a part of this Agreement as fully as though set forth specifically herein.' 35 F.C.C.2d at 708. The subsequently filed tariff was not (as here) inconsistent with the contract, but rather was expressly contemplated by the parties in their agreement, and supplied the missing contract rate. The use of a tariff as an integral part of a contract may not be compared with the use of a tariff to abrogate a contract. Cf. United Gas Co. v. Memphis Light, Gas & Water Division, 358 U.S. 103, 79 S.Ct. 194, 3 L.Ed.2d 153 (1958); Richmond Power & Light Co. v. F.P.C., 156 U.S.App.D.C. 315, 481 F.2d 490, 492-493 (1973), cert. denied, 414 U.S. 1068, 94 S.Ct. 578, 38 L.Ed.2d 473 (1974). Cincinnati, New Orleans & Texas Pacific Railway Co. v. Chesapeake and Ohio Railway Co., 441 F.2d 483 (4th Cir. 1971), is also distinguishable. At issue in Cincinnati was the right of a railroad to recover charges under a tariff that had already become effective. The Court's conclusion that the charges were recoverable (despite the fact that the tariff abrogated a contract) was based on the well-established principle that a 'tariff, so long as it is in effect, must be treated as though it has the force of law.' 441 F.2d at 488. In the instant case, A T & T's tariff has not yet been put into effect (the Commission having rejected it) and thus cannot claim the support of the principle articulated in Cincinnati. Finally, we regard petitioner's reliance upon A T & T v. F.C.C., 487 F.2d 865 (2d Cir. 1973) to be unpersuasive.[52] It was A T & T, and not the FCC, that set the current A T & T-- Western Union contract rate. Thus, if any party 'froze' the rate, it was A T & T, and not the Commission.
 
 
 159
 Accordingly, we agree with the Commission's conclusion that the Communications Act does not authorize the modification or abrogation of contracts by subsequently filed tariffs. It follows from this conclusion that the FCC acted properly in rejecting the A T & T tariff (to the extent that the tariff conflicted with the A T & T-- Western Union contracts), the Commission having the power to 'perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions.' 47 U.S.C. 154(i). See United Gas Co. v. Mobile Gas Corp., 350 U.S. at 347, 76 S.Ct. 373 (construing a similar provision of the Natural Gas Act); cf. Associated Press v. FCC, 145 U.S.App.D.C. 172, 448 F.2d 1095, 1103 (1971) (dictum).[53]
 
 
 160
 We conclude that the FCC's FX and CCSA orders (P53 and P54) and the Commission's partial rejection of the A T & T tariff (P55) are proper. The Commission's decision and order in Docket 19896, 46 F.C.C.2d 413, will be affirmed.
 
 APPENDIX
 
 161
 53. Accordingly, It is Ordered, that American Telephone and Telegraph Company and the Bell System companies enumerated in paragraph 18 of our Memorandum Opinion and Order to Show Cause, 44 F.C.C.2d 245 at 251,[54] comply with the following not later than ten days after the release of this Decision:
 
 
 162
 (a) Furnish to MCI Telecommunications Corporation, MCI New York West, Inc. and other specialized common carriers the interconnection facilities essential to the rendition of all of their presently or hereafter authorized interstate and foreign communications services and to enable the said specialized common carriers to terminate their authorized interstate and foreign communications services, including interconnection by the specialized carriers into a telephone company's local exchange facilities for the purpose of furnishing Foreign Exchange (FX) service or for insertion into telephone company Common Control Switching Arrangements (CCSA);
 
 
 163
 (b) Furnish the interconnection facilities specified in subparagraph (a) above on reasonable terms and conditions; and file with the Commission pursuant to Section 203 of the Act and Part 61 of the Commission's Rules, tariff schedules to cover interconnection facilities for all of the authorized interstate and foreign communications services of the specialized common carriers;
 
 
 164
 (c) The specialized common carriers shall be charged for the interconnection facilities and services furnished by American Telephone and Telegraph Company and the Bell System companies, in connection with the transmission by the specialized carriers of authorized interstate and foreign communications and the provision of authorized interstate and foreign communications services, solely and exclusively pursuant to the charges, terms, and conditions specified in tariffs filed with the Commission; and
 
 
 165
 (d) Furnish to the specialized carriers for their authorized interstate and foreign communications services, interconnection facilities similar to those presently provided to Bell's Long Lines Department on a non-discriminatory basis.
 
 
 166
 54. It is Further Ordered, pursuant to the authority contained in the provisions of Sections 4(i) and 205(a) of the Communications Act, that American Telephone and Telegraph Company and the Bell System companies shall not later than ten days after the release of this Decision Cease and Desist from:
 
 
 167
 (a) Engaging in any conduct which results in a denial of, or unreasonable delay in establishing, physical connections with MCI and other specialized common carriers for their presently or hereafter authorized interstate and foreign communications services;
 
 
 168
 (b) Implementing any policy or practice which forecloses the establishment of through routes, and charges, facilities and regulations applicable thereto, in connection with MCI's and other specialized common carrier parties' presently or hereafter authorized interstate and foreign communications services;
 
 
 169
 (c) Implementing any policy or practice which results in denying to MCI or any other carrier party reasonable interconnection services similar to those provided to the Long Lines Department of the American Telephone and Telegraph Company in connection with the authorized interstate and foreign communications services of such other carriers; and
 
 
 170
 (d) Charging MCI or the other specialized common carrier parties for interconnection facilities furnished in connection with the authorized interstate and foreign communications services of the said specialized carriers pursuant to tariffs filed with state regulatory commissions or delaying or refusing to furnish requested interconnection facilities for such purposes pending approval by state regulatory commissions of the furnishing of the aforementioned facilities.
 
 55. It Is Further Ordered that:
 
 171
 (a) Insofar as the tariffs filed by Bell include interconnection facilities and services covered by the Bell-Western Union exchange of facilities contracts and used by Western Union in connection with the provisions of its authorized interstate services, they Are Rejected; and
 
 
 172
 (b) With respect to any services and facilities not covered by the abovementioned contracts but which are furnished by the Bell System companies for the use of Western Union in connection with the provision of its authorized interstate communications services, the telephone companies shall furnish the said interconnection facilities on reasonable terms and conditions; and charge Western Union for the provision of such interconnection facilities solely and exclusively pursuant to tariffs filed with this Commission pursuant to Section 203 of the Communications Act and Part 61 of the Rules.
 
 
 
 [1]
 Our jurisdiction to review the FCC order is predicated upon 47 U.S.C. 402(a) and 28 U.S.C. 2342
 
 
 [2]
 The order and supporting decision are published at 46 F.C.C.2d 413 (1974)
 
 
 [3]
 A 'specialized' common carrier is a carrier that does not provide the full range of communications services contemplated by the Communications Act, 47 U.S.C. 151 et seq. For the purposes of this opinion, the phrase 'specialized common carrier' shall refer to carriers who specialize in 'private line services.'
 'Private line service' provides the largescale telephone customer with full-time private circuits for the transmission of communications between locations specified by the customer. The service operates to give the customer continuous communication without requiring the carrier to establish a new connection for each call or message.
 
 
 [4]
 'FX' and 'CCSA' are defined by the Federal Communications Commission as follows: Foreign exchange (FX) is a private line service that is partially 'switched'. It allows a businessman located in one state to, in effect, maintain a local phone in another state. Under FX, for example, a businessman in Washington can be reached by telephone subscribers in New York City and can himself reach New York City telephone subscribers (through a local loop in Washington, a Washington-New York interexchange line, and a business line in the New York City exchange area). However, New York City telephone subscribers could not reach Washington subscribers other than the Washington businessman over FX private line service and the latter would have to maintain a separate telephone in order to tie into the Washington exchange area. A Common Control Switching Arrangement (CCSA) is a private line system for linking the various offices of a large company through large switches on a local telephone company's premises instead of through PBX switches on the customer's premises. The private line circuits furnished in CCSA are provided for the exclusive use of the CCSA customers. However, the switching machines are shared with other private line service customers
 
 
 [46]
 F.C.C.2d at 418, n. 5 (1974). See also MCI Communications Corp. v. American Telephone & Telegraph Co., 496 F.2d 214, 216 n. 5 (3d Cir. 1974)
 
 
 [5]
 An appeal was taken, however, by other interested parties. This appeal is still pending in the Ninth Circuit as Washington UTC v. FCC (No. 71-2919) and as NARUC v. FCC, (No. 72-1198)
 
 
 [6]
 We mention this October 19th letter only to provide a complete procedural background. The Commission did not rely upon this letter in reaching its conclusions below, 46 F.C.C.2d at 430, and similarly we give no weight to the letter in the substantive portions of this opinion
 
 
 [7]
 The Second Circuit transferred A T & T's appeal (from the October 4th order) to this Court. The transferred case, docketed as No. 74-1306, has not yet been argued
 
 
 [8]
 47 U.S.C. 406 provides that:
 The district courts of the United States shall have jurisdiction upon the relation of any person alleging any violation, by a carrier subject to this chapter, of any of the provisions of this chapter which prevent the relator from receiving service in interstate or foreign communication by wire or radio, or in interstate or foreign transmission of energy by radio, from said carrier at the same charges, or upon terms or conditions as favorable as those given by said carrier for like communication or transmission under similar conditions to any other person, to issue a writ or writs of mandamus against said carrier commanding such carrier to furnish facilities for such communication or transmission to the party applying for the writ; Provided, That if any question of fact as to the proper compensation to the carrier for the service to be enforced by the writ is raised by the pleadings, the writ of peremptory mandamus may issue, notwithstanding such question of fact is undetermined, upon such terms as to security, payment of money into the court, or otherwise, as the court may think proper pending the determination of the question of fact: Provided further, That the remedy given by writ of mandamus shall be cumulative and shall not be held to exclude or interfere with other remedies provided by this chapter.
 
 
 [9]
 MCI Communications Corp. v. American Telephone & Telegraph Co., 496 F.2d 214 (3d Cir., 1974)
 
 
 [10]
 Throughout the remainder of this opinion, we shall refer to the Commission's April 23rd decision as Docket 19896
 Intervening in the Commission's proceeding were MCI, American Satellite Corporation, Data Transmission Company, The Western Union Telegraph Company, N-Triple-C, Inc., Southern Pacific Communications Company, CML Satellite Corporation, Western Tele-Communications, Inc., CPI Microwave, Inc., The Chesapeake and Potomac Telephone Company, RCA, Global Communications, Inc. and the United States Independent Telephone Association.
 
 
 [11]
 We shall, at times, refer to the Specialized Common Carrier Services decision as Docket 18920
 
 
 [12]
 In support of its assertion that Specialized Common Carrier Services dealt only with 'local looping,' A T & T notes that the FCC has similarly characterized the 1971 proceedings in a brief submitted to the Ninth Circuit. At oral argument herein, the Commission stated that any such representation was unintentional, and we so regard it
 
 
 [13]
 In Docket 18920, the FCC stated:
 
 
 [78]
 A T & T claims that the diversion of revenues from new entry would not be insubstantial and might prejudice telephone users by delaying the installation of large capacity facilities (e.g., L5 coaxial cable carrier systems) on high density routes-- thereby jeopardizing the realization of declining unit costs which would benefit all classes of A T & T's customers. A T & T claims that competing carriers would simply be engaged in 'cream-skimming' and thus cause A T & T to depart from nationwide costaveraging and the maintenance of nationwide uniform interstate rates. Like the staff, we do not see how there could be any diversion of revenues of a magnitude to have the impact claimed by A T & T, in view of the very small percentage of A T & T's existing total market that is vulnerable to competition of the kind proposed here, the growth rate of Bell's basic services, and the likelihood that A T & T would obtain a very substantial share of the potential market for specialized services
 
 
 [79]
 A T & T's reports to us indicate that the Bell System had gross operating revenues of approximately $16.9 billion in 1970, as compared to about $15.7 billion in 1969 (not including income from other sources such as Western Electric). Most of these revenues were derived from intrastate and interstate services which the applicants do not seek to provide. Interstate revenues constitute about 30 percent of A T & T's total revenues, and about 87 percent of the interstate revenue is derived from message toll telephone (MTT) and wide area telephone services (WATS). Interstate private line revenues (including revenue from program transmission-- a service not proposed by the applicants) amount to about 4% Of total Bell System revenues. While there is some data usage of the switched network, it has been estimated that such usage (measured in terminal hours) accounted for less than 1% Of total usage (intrastate and interstate) in 1968 (1 SRI Report 7379B, p. 51), and about 1.7% In 1969 (paragraph 34 above)
 
 
 [80]
 Projecting present growth rates, A T & T has estimated that the existing plant of the Bell System would quadruple by 1980. As indicated in paragraph 63 above, this projection is based primarily upon the rapidly expanding growth in the use of standard voice communications services. Revenues from interstate MTT and WATS had an annual growth rate of about 12 percent from 1965 to 1969. During the same period the growth rate for interstate private line services was about 15 percent, and A T & T estimates that revenue from such services would amount to.$2.7 billion by 1980. This figure would still constitute a relatively small percentage of total interstate revenues when compared to the compounded effect of a 12 percent annual growth in interstate MTT and WATS revenues. In this proceeding A T & T stated that the growth rate in the volume of data transmission over the past five years has been in the range of 50 percent annually (A T & T reply comments, page 35), and in the Computer Inquiry it estimated that data usage would amount to 5-10 percent of peak network load by 1980. Though A T & T does not indicate what proportion of this data growth and projected usage is interstate, the percentage of data usage by 1980 would be a comparatively small percentage of total usage even assuming that it were all interstate
 
 
 [81]
 While A T & T does not challenge the revenue figures used by the staff or those used by MCI, it claims that the staff erred in assuming that private line does not represent a significant portion of the use of existing or future systems. It may be, as alleged by A T & T, that private line service accounts for about 25 percent of A T & T's total interstate channel miles. However, the point raised in the staff's analysis is that the portion of A T & T's total business which might be jeopardized, i.e., the interstate private line business, represented only a very small fraction of Bell's total revenues. In terms of the total investment of the Bell System, the investment in all interstate circuitry is of much less significance than the 25 percent of interstate channel miles noted by A T & T as being devoted to the private line services. Moreover, the total private line circuit mileage usage includes television program transmission which is a relatively voracious consumer of interstate channel mileage. For example, from 600-1200 voice circuits can be derived from the bandwidth required for a single video channel (depending on the age and type of equipment utilized). We might also note that with the rapid growth in demand for circuitry for services other than private line, the rapid growth anticipated for the specialized services and the time frame which will be required for implementation of the plans of potential competitors, we cannot visualize A T & T being burdened with unusable quantities of circuitry for any significant period of time
 
 
 [82]
 Most significantly, we see no reason whatsoever to assume that the applicants would divert all or even a substantial portion of that comparatively small percentage of existing and projected Bell System business that is vulnerable to competition. As previously stated, the competition is for evolving, new, diverse and specialized needs in a dynamic, rapidly growing market. The applicants are seeking in large part to exploit latent demands and may well expand the size of the total communications market. Moreover, they are proposing very small scale operations compared to those of A T & T. MCI anticipates only about $55 million in total annual revenues from all of the MCI systems covered by applications on file at the time of its comments (Appendix C, page 3). Datran's proposed plant investment is only about $350 million, compared to A T & T's 1970 plant investment of approximately $54.8 billion and its investment programs of $7.7 and $8.2 billion for 1971 and 1972. Datran has indicated that it hopes to obtain about 10 percent of the data market by 1980. In addition, the introduction of new services and facilities by the specialized carriers would take place gradually over a period of time, with the volume paralleling the market growth in demand for specialized services. And, finally, A T & T is adapting to supply certain specialized services which have not been adequately provided in the past (e.g., its proposed digital data network), and is free to compete with the specialized carriers for the potential market. A T & T has vast competitive resources, and it is likely that it will succeed in obtaining a very substantial portion of the large potential market
 
 
 [14]
 Cf. MCI Communications Corp. v. American Telephone & Telegraph Co., supra, 369 F.Supp. at 1013 ('Bell includes FX and CCSA in the category of private line service in their tariffs and in all of their private line sales literature, manuals, and the like.')
 
 
 [15]
 We note that in characterizing MCI's application, the Commission stated in its Notice of Proposed Rule-Making:
 According to MCI, the 'real distinction which delineates MCI service from anything provided today by existing common carriers is not the facility itself but the manner in which a customer may utilize it in order to provide a customized intra-company point-to-point communications system of his own design and capability.' For example, the customer may purchase the exact bandwidth required on a point-to-point basis (including one-way channels), utilize it in whatever transmission mode he chooses (voice or date, alternately or sigly), mix different bandwidths on the same channel, use his own terminal equipment and install his own equipment on MCI towers and shelters, provide either analog or digital input signals, and avail himself of MCI's offering of channels designed especially for data use with rates based on transmission speed rather than bandwidth.
 
 
 [24]
 F.C.C.2d at 323
 
 
 [16]
 In its 'enforcement' proceeding (Docket 19896), the Commission explained unequivocally that it had intended to include FX and CCSA within its Docket 18920 'rule.' The FCC stated that:
 The Specialized Common Carrier Services proceeding involved rulemaking for the determination of basic policies with respect to the provision of private line services by the specialized carriers. While FX and CCSA are not specifically mentioned in the Specialized Common Carrier Services decision, this is because we were concerned with private line services generally and did not specifically focus on interconnection for FX and CCSA services or any others. It should be noted that the Commission considered the possibility of the 'total diversion' of Bell's private line revenues, although the possibility was deemed to be remote. We would not have discussed this remote possibility of a 'total diversion' of Bell's private line services if the competition offered by the specialized carriers were not to include FX and CCSA services, which account for a substantial share of Bell's total private line revenues. These services come within the terms of our order, and rightly so, because there is no distinction in principle to separate them from other types of interconnection.
 
 
 [46]
 F.C.C.2d at 424-425
 
 
 [17]
 It should be noted that two of the three members of the panel in the instant case (Judges Weis and Garth) were members of the panel that decided MCI Communications Corp. v. A. T. & T
 
 
 [18]
 29 F.C.C.2d at 871 (1971)
 
 
 [19]
 See Western Union Telegraph Co., 17 F.C.C. 152, reconsideration denied, 17 F.C.C. 503 (1952)
 
 
 [20]
 309 U.S. 134, 60 S.Ct. 437, 84 L.Ed. 656 (1940)
 
 
 [21]
 390 U.S. 747, 777, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968)
 
 
 [22]
 See, e.g., NLRB v. Bell Aerospace Co., Division of Textron, Inc., 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974)
 
 
 [23]
 At least one other Circuit has demonstrated a similar reticence to prohibit the use of nonevidentiary hearings in the absence of a clear Congressional mandate. See American Airlines, Inc. v. CAB, 123 U.S.App.D.C. 310, 359 F.2d 624, 629 (1966) (en banc); cf. National Air Carrier Association v. CAB, 141 U.S.App.D.C. 31, 436 F.2d 185, 194 (1970)
 
 
 [24]
 NLRB v. Bell Aerospace Co., Division of Textron, Inc., 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974), aff'g in part, rev'g in part, 475 F.2d 485 (2d Cir. 1973), is not to the contrary. In Bell Aerospace, the Second Circuit held that the Labor Board erred in conducting adjudicatory (rather than rule-making) proceedings to develop policy at odds with prior policy positions of the Board. The Supreme Court's reversal does not suggest (as A T & T would have us hold) that rule-making was inappropriate and that evidentiary hearings were required. Instead, the Court held only that the NLRB had not abused its discretion in opting for an adjudicatory procedure. 416 U.S. at 290-295, 94 S.Ct. 1770-1772. Our holding in this case is entirely consistent with the Supreme Court's affirmation of agency discretion in procedural matters
 
 
 [25]
 On the other hand, it is well settled that there is no need for an evidentiary hearing when there is no material factual dispute involved. See, e.g., Denver Union Stock Yard Co. v. Producers Livestock Marketing Association, 356 U.S. 282, 78 S.Ct. 738, 2 L.Ed.2d 771 (1958); Appalachian Power Co. v. E.P.A., 477 F.2d 495, 501 (4th Cir. 1973); Municipal Light Boards v. F.P.C., 146 U.S.App.D.C. 294, 450 F.2d 1341, 1345 (1971), cert. denied, 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 445 (1972); UpJohn Co. v. Finch, 422 F.2d 944, 955 (6th Cir. 1970); Citizens for Allegan County, Inc. v. F.P.C., 134 U.S.App.D.C. 229, 414 F.2d 1125, 1128 (1969) (and cases cited at 1128, n. 5)
 
 
 [26]
 We have previously noted that:
 An attempt to draw a bright line between situations requiring adjudicative hearings and those calling for rule-making is a task often unresponsive to the actual problems presented in a given case. Rather, a growing body of case law and scholarly discussion has indicated that hybrid proceedings, tailored to the types of issues contested, appear to be a salutary alternative to efforts to sketch a rigid demarcation.
 Duquesne Light Co. v. E.P.A., 481 F.2d 1, 5-6 (3d Cir. 1973).
 
 
 [27]
 The sufficiency of the notice regarding Docket 18920 is discussed at p. 1269, infra
 
 
 [28]
 In reaching this conclusion, we also reject A T & T's arguments: (1) that the Commission's focus upon an individual carrier required an evidentiary hearing, and (2) that the FCC did not follow proper rule-making procedures. Both of these arguments are predicated upon the characterization of Docket 19896 as an independent proceeding, a characterization which we have rejected (see pp. 1259-1263, supra)
 
 
 [29]
 See pp. 1259-1263, supra
 
 
 [30]
 346 U.S. 86, 73 S.Ct. 998, 97 L.Ed. 1470 (1953)
 
 
 [31]
 498 F.2d 771 (D.C.Cir. 1974)
 31A The United States Independent Telephone Association (USITA), an intervenor, advances its own separate overbreadth argument. In Docket 19896, the Commission stated:
 The show cause order in this proceeding was directed only to American Telephone and Telegraph Company and to the Bell System operating companies. Consequently, cease and desist orders are appropriate only against such companies and will not be issued against any non-Bell companies. However, we wish to place all telephone companies on notice that our policy declarations with respect to interconnection apply to them as well as to the Bell companies. We also emphasize that we expect compliance by all telephone companies with such policy declarations and the orders issued pursuant thereto in the absence of a substantial showing that a particular request for interconnection would result in damage to the telephone system or is otherwise inconsistent with the public interest. Should such compliance not be forthcoming, the offending company will be made the subject of a show cause proceeding or other appropriate remedial action will be taken expeditiously.
 
 
 [46]
 F.C.C.2d at 437. USITA claims that since the Docket 19896 proceedings involved only interconnection between A T & T and the specialized carriers, the extension to specialized carrier-independent carrier interconnection is unfounded. We disagree. The above quoted paragraph primarily reminds the independent carriers that they are subject to the policies announced in Specialized Common Carrier Services, 29 F.C.C.2d 870 (1971). Any objections that the independent carriers have with specific matters of interconnection may be raised before the FCC in separate proceedings and accordingly, are not before this Court at the present time
 
 
 [32]
 The phrase 'exchange of facilities' is apparently a misnomer. A T & T does not receive equipment in return for its facilities, but instead receives monetary compensation. Thus, the contracts at issue more resemble leases than actual 'exchange of facilities' contracts
 
 
 [33]
 In a letter dated September 28, 1973, A T & T announced to Western Union its intention to file tariffs to cover services normally provided for under the 'exchange of facilities' contracts
 
 
 [34]
 See pp. 1257-1258 supra
 
 
 [35]
 The Commission did note that the contracts presented certain difficulties. Western Union complained that the tariff rates far exceeded the contract rates. If, as Western Union alleges, the tariff rates are unreasonably high, this means that all other carriers (who would be bound by the tariffs) are paying excessive rates. If, on the other hand, the differential between the contract and tariff rates is justifiable, this can only mean that Western Union's low rates confer upon it an unlawful preference. The FCC therefore announced in its April 24th decision that it would institute sepapate proceedings 'to determine whether the contract or tariff rates are unreasonably high, unreasonably low, or otherwise discriminatory.'
 
 
 [36]
 209 U.S. 56, 28 S.Ct. 428, 52 L.Ed. 681 (1908)
 
 
 [37]
 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956)
 
 
 [38]
 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956)
 
 
 [39]
 15 U.S.C. 717 et seq
 
 
 [40]
 16 U.S.C. 791a et seq
 
 
 [41]
 The Court noted that (under the Commerce Act):
 One rate is to be charged and that the one fixed and published in the manner pointed out in the statute, and subject to change in the only way open by the statute. There is no provision for the filing of contracts with shippers and no method of making them public defined in the statute.
 209 U.S. at 81, 28 S.Ct. at 435.
 
 
 [42]
 See S.Rep.No.781, Committee on Interstate Commerce, 73d Cong., 2d Sess. at 2 (1934)
 
 
 [43]
 A T & T emphasizes the fact that it has not filed the original copy of its Western Union contracts with the FCC, but rather has merely filed a photo-copy of same. We fail to appreciate any real significance in this assertion
 
 
 [44]
 We note that the history of business relations between A T & T and Western Union indicate that the two companies have, since 1928, assumed that it is proper to govern their 'exchange of facilities' by contract
 
 
 [45]
 Section 5(a) of the Natural Gas Act provides:
 (a) Whenever the Commission, after a hearing had upon its own motion or upon complaint of any State, municipality, State commission, or gas distributing company, shall find that any rate, charge, or classification demanded, observed, charged, or collected by any natural-gas company in connection with any transportation or sale of natural gas, subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order: Provided, however, That the Commission shall have no power to order any increase in any rate contained in the currently effective schedule of such natural gas company on file with the Commission, unless such increase is in accordance with a new schedule filed by such natural gas company: but the Commission may order a decrease where existing rates are unjust, unduly discriminatory, preferential, otherwise unlawful, or are not the lowest reasonable rates.
 15 U.S.C. 717d(a).
 
 
 [46]
 350 U.S. at 338, 76 S.Ct. 373
 
 
 [47]
 The Court states:
 Absent the Act, a unilateral announcement of a change to a contract would of course be a nullity . . ..
 350 U.S. at 339, 76 S.Ct. at 378.
 
 
 [48]
 350 U.S. at 339-344, 76 S.Ct. 373
 
 
 [49]
 47 U.S.C. 203(b) provides:
 No change shall be made in the charges, classifications, regulations, or practices which have been so filed and published except after thirty days' notice to the Commission and to the public, which shall be published in such form and contain such information as the Commission may by regulations prescribe; but the Commission may, in its discretion and for good cause shown, modify the requirements made by or under authority of this section in particular instances or by a general order applicable to special circumstances or conditions.
 
 
 [50]
 47 U.S.C. 204 provides:
 Whenever there is filed with the Commission any new charge, classification, regulation, or practice, the Commission may either upon complaint or upon its own initiative without complaint, upon reasonable notice, enter upon a hearing concerning the lawfulness thereof; and pending such hearing and the decision thereon the Commission, upon delivering to the carrier or carriers affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such charge, classification, regulation, or practice, but not for a longer period than three months beyond the time when it would otherwise go into effect; and after full hearing the Commission may make such order with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made within the period of the suspension, the proposed change of charge, classification, regulation, or practice shall go into effect at the end of such period; but in case of a proposed increased charge, the Commission may by order require the interested carrier or carriers to keep accurate account of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require the interested carrier or carriers to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased charges as by its decision shall be found not justified. At any hearing involving a charge increased, or sought to be increased, after the organization of the Commission, the burden of proof to show that the increased charge, or proposed increased charge, is just and reasonable shall be upon the carrier, and the Commission shall give to the hearing and decision of such questions preference over all other questions pending before it and decide the same as speedily as possible.
 
 
 [51]
 Section 4(d) of the Natural Gas Act provides:
 (d) Unless the Commission otherwise orders, no change shall be made by any natural-gas company in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after thirty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the thirty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.
 15 U.S.C. 717c(d).
 
 
 [52]
 Section 205(a) of the Communications Act provides, in part, that:
 Whenever, after full opportunity for hearing, upon a complaint or under an order for investigation and hearing made by the Commission on its own initiative, the Commission shall be of opinion that any charge, classification, regulation, or practice of any carrier or carriers is or will be in violation of any of the provisions of this chapter, the Commission is authorized and empowered to determine and prescribe what will be the just and reasonable charge or the maximum or minimum, or maximum and minimum, charge or charges to be thereafter observed, and what classification, regulation, or practice is or will be just, fair, and reasonable, to be thereafter followed, and to make an order that the carrier or carriers shall cease and desist from such violation to the extent that the Commission finds that the same does or will exist, and shall not thereafter publish, demand, or collect any charge other than the charge so prescribed, or in excess of the maximum or less than the minimum so prescribed, as the case may be, and shall adopt the classification and shall conform to and observe the regulation or practice so prescribed.
 In A T & T v. F.C.C., supra, the Second Circuit analogized an order compelling A T & T to continue charging prior tariff rates to a 'prescription' order. 487 F.2d at 875 ('Under the circumstances of this case, we see no difference between a 'prescription' of new rates and a 'freeze' of old rates.'). Since a prescription order cannot be issued without the FCC first conducting a hearing (see 205(a), supra), the Court struck down a 'freeze' order for failure to conduct a 205(a) hearing.
 
 
 [53]
 In light of the above conclusion, we find it unnecessary to discuss alternate contentions offered by the FCC in support of its partial rejection of the A T & T tariffs
 
 
 [54]
 The companies enumerated are: Bell Telephone Company of Pennsylvania, C & P Telephone Company of Washington, D.C., The C & P Telephone Company of Maryland, The C & P Telephone Company of Virginia, The C & P Telephone Company of West Virginia, Cincinnati Bell, Inc., Illinois Bell Telephone Company, Indiana Bell Telephone Company, Michigan Bell Telephone Company, Mountain States Telephone and Telegraph Company, New England Telephone and Telegraph Company, New Jersey Bell Telephone Company, New York Telephone Company, Northwestern Bell Telephone Company, The Ohio Bell Telephone Company, Pacific Northwest Bell Telephone Company, The Pacific Telephone and Telegraph Company, South Central Bell Telephone Company, Southern Bell Telephone and Telegraph Company, The Southern New England Telephone Company, Southwestern Bell Telephone Company, and Wisconsin Telephone Company