**AMERICAN TELEPHONE AND TELE-GRAPH COMPANY, Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION,**

**MCI Telecommunications Corporation and United States Transmission Systems, Inc., Intervenors.**

**No. 74–1953.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 16, 1975.

Decided July 6, 1976.

Charles A. Horsky, Washington, D. C., with whom Michael Boudin and Arthur F. Fergenson, Washington, D. C., and Alfred C. Partoll and F. Mark Garlinghouse, New York City, were on the brief, for appellant.

John E. Ingle, Counsel, F. C. C., with whom Ashton R. Hardy, Gen. Counsel, F. C. C., and Joseph A. Marino, Associate Counsel, F. C. C., at the time the brief was filed, were on the brief, for appellee.

Edward P. Taptich, Washington, D. C., with whom Joseph M. Kittner, Washington, D. C., was on the brief, for intervenor United States Transmission Systems, Inc.

Michael H. Bader,. Kenneth A. Cox, William J. Byrnes, and Raymond C. Fay, Washington, D. C., were on the brief for intervenor MCI Telecommunications Corp.

Before BAZELON, Chief Judge, and WRIGHT and ROBINSON, Circuit Judges.

Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.

J. SKELLY WRIGHT, Circuit Judge:

In its 1971 *Specialized Carriers* decision [1] the Federal Communications Commission, through judicially approved rulemaking, adopted a policy in favor of open competition in the specialized communications field. In 1973 United States Transmission Systems, Inc. (USTS), a subsidiary of International Telephone and Telegraph Company and an intervenor herein, filed with the Commission applications to construct new microwave radio stations to provide service pursuant to *Specialized Carriers.* After considering a petition to deny filed by appellant American Telephone and Telegraph Company (AT&T), the Commission, in September 1974, granted USTS's applications.[2] This appeal followed.

Appellant asserts that the *Specialized Carriers* decision was premised on the Commission's assumption that new specialized common carriers, such as USTS, if permitted to compete with established telephone companies for provision of private line services as described below, would offer new and different types of service which would expand the total communications market and not significantly divert traffic from existing markets. From this it argues that the Commission, in applying this policy to USTS's applications, was required either to make specific findings that the proposed

---

1. *Specialized Common Carrier Services,* 29 FCC2d 870, *reconsideration denied,* 31 FCC2d 1106 (1971), *aff'd, sub nom. Washington Utilities & Transportation Comm'n v. FCC,* 513 F.2d 1142 (9th Cir.), *cert. denied,* 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975).

2. *United States Transmission Systems, Inc.,* 48 FCC2d 859 (1974), *reconsideration denied,* 51 FCC2d 207 (1975) (hereinafter *Decision* ).

service would meet these conditions or to justify the absence of such findings, and that in any event the Commission was required to hold an evidentiary hearing. Being unpersuaded by these arguments, we affirm the Commission's order.

## I. BACKGROUND

At issue in this case is the Commission's policy relating to private line communications services provided by specialized common carriers (private line services).[3] The Commission first considered competitive provision of such services in *Microwave Communications, Inc.*[4] where it granted, over the objection of existing common carriers including AT&T, an application of a specialized carrier to provide private line services between Chicago and St. Louis. The Commission there rejected the common carriers' claims that provision of the service would divert revenues from existing carriers and would result in inefficient utilization of the frequency spectrum. In denying reconsideration the Commission also specifically rejected the argument that its action rested on a rationale of "competition for competition's sake," contrary to *FCC v. RCA Communications, Inc.*, 346 U.S. 86, 73 S.Ct. 998, 97 L.Ed. 1470 (1953) (hereinafter *RCA*).

Following *Microwave Communications, Inc.* the Commission received a number of similar applications from specialized carriers. Rather than reviewing each through adjudicatory proceedings, and in order to resolve certain policy questions relating generally to competitive provision of private line services, the Commission, in 1970, initiated the *Specialized Carriers* rulemaking proceeding by publishing notice of its intent to formulate appropriate policies.[5] In its *Notice* the Commission identified a number of questions requiring resolution, the first being "[w]hether as a general policy the public interest would be served by permitting the entry of new carriers in the specialized communications field * * * [t]he resolution of [which] is obviously of threshold policy significance and, in large measure, will constitute the predicate for decisional treatment of the remaining questions."[6]

There followed extensive filings from some 200 interested parties including AT&T which argued, as it does here, that no need had been shown for competitive provision of private line services, that to allow specialized carriers to enter this market would violate the principles of *RCA*, that additional competition would divert substantial revenue from and otherwise have a significant

**3.** The Commission's rules define "private line service" as follows:

> A service whereby facilities for communication between two or more designated points are set aside for the exclusive use or availability for use of a particular customer and authorized users during stated periods of time.

47 C.F.R. § 21.1 (1975). As appellant notes: Private line service offers to users "dedicated" circuits between designated geographical points on a continuous and exclusive basis for a fixed monthly charge. Private line subscribers are almost invariably ·businesses with significant communications requirements between fixed points, such as a company headquarters and a factory. Private line service differs from ordinary long-distance service—known as message telecommunications service ("MTS")—in which the user may call telephones throughout the country connected into the public switched telephone network and is charged on a per-call basis. For many years, American Telephone and Telegraph Company ("AT&T"),

together with local telephone companies, has offered a range of private line services throughout the United States, including circuits for "voice grade," teletypewriter, data, and radio and television signals, as well as bulk or "wideband" circuits that can be subdivided as the user requires.

Appellant's br. at 4 (footnote omitted).

**4.** 18 FCC2d 953 (1969), *reconsideration denied*, 21 FCC2d 190 (1970).

**5.** *Specialized Common Carrier Services, Notice of Inquiry to Formulate Policy, Notice of Proposed Rule Making, and Order*, 24 FCC2d 318 (1970) (hereinafter *Notice*).

**6.** *Id.* at 327. · The other four questions concerned whether comparative hearings would be necessary, what standards would be necessary to avoid frequency conflicts, whether the applicants' subscribers would need some protection as to quality and reliability of service, and what is the appropriate means of local distribution of the proposed services. *Id.*

detrimental impact upon existing common carriers, and that an evidentiary hearing to consider all such matters was required.[7] On June 3, 1971 the Commission released its *Specialized Carriers* decision. In that decision the Commission addressed AT&T's arguments and explained its reasons for rejecting each of them.[8] It concluded that there is a public need and demand for the proposed services, that it is likely that new entry will have some beneficial effects and little if any adverse impact on existing carriers, and "that a general policy in favor of the entry of new carriers in the specialized communications field would serve the public interest, convenience, and necessity."[9]

AT&T sought neither reconsideration nor judicial review of *Specialized Carriers.* Other parties, however, did take an appeal. And in *Washington Utilities & Transportation Comm'n v. FCC,* 513 F.2d 1142 (9th Cir.), *cert. denied,* 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975) (hereinafter *Washington Utilities*), the Ninth Circuit affirmed the Commission's decision in all respects.

Between the time of *Specialized Carriers* and the proceeding here under review, AT&T twice raised arguments that these newly authorized competitive services are unneeded and potentially detrimental to the public interest and ought to be approved, if at all, only following individual evidentiary hearings. Initially, in October 1973, AT&T filed with the Commission a petition which sought "a full and complete evidentiary hearing into the regulatory and policy prob-

lems presented by the licensing of a proliferation of competing common carriers," and which requested that the Commission "defer granting further applications for facilities by the new competing carrier entrants pending the outcome of such evidentiary hearings."[10] In that petition AT&T urged, as it did in *Specialized Carriers* and does again in the instant appeal, that further competitive entry by specialized carriers would divert revenues from existing carriers and that the specialized carriers do not offer new and diverse services, but "simply duplicate existing services which they wish to creamskim to the detriment of the remaining customers of the established carriers."[11] Emphasizing that these arguments had already been fully examined in *Specialized Carriers,* the Commission denied the petition.[12] Finally, on a petition for reconsideration AT&T raised the arguments once more.[13] Again the Commission considered the contentions of revenue diversion, duplication of services, and creamskimming. On November 18, 1974 the Commission denied the petition.[14]

## II. THE INSTANT PROCEEDING

On July 11, 1973 USTS filed with the Commission the instant applications to construct new microwave radio stations pursuant to *Specialized Carriers.* Through these applications USTS proposed to establish the "backbone" of an interstate common carrier system to provide specialized private line services along a corridor from New York City to Houston via Atlanta. As summarized in the Commission's *Decision* the serv-

7. *See Specialized Carriers,* 29 FCC2d at 958–962.

8. *Id.* at 876–878, 887–889, 896–920.

9. *Id.* at 920.

10. AT&T Petition, Regulatory and Policy Problems Presented by the Licensing of a Proliferation of Competing Common Carriers (Oct. 4, 1973) (hereinafter Moratorium Petition), at 1–2, 39, JA 121–122, 159.

11. *Id.* at 6, 11–12, JA 126, 131–132.

12. *Commission Policies Governing the Licensing and Regulation of Specialized Common Carriers,* 44 FCC2d 467 (1973), *reconsideration*

*denied,* 50 FCC2d 416 (1974) (hereinafter *Commission Policies*). The Commission reaffirmed the position taken in *Specialized Carriers* that it would monitor future developments and modify its policies if warranted by changed circumstances. 44 FCC2d at 471 n.2.

13. AT&T Petition for Reconsideration, Commission Policies Governing the Licensing and Regulation of Specialized Common Carriers (Jan. 11, 1974), JA 261.

14. *Commission Policies Governing the Licensing and Regulation of Specialized Common Carriers,* 50 FCC2d 416 (1974).

ices USTS offered would in some respects duplicate services already offered by existing common carriers and in other respects supplement and provide additional services to those previously available.[15] Specifically, the initial market projected in the applications was provision of voice-grade private line service similar to that already offered in the corridor by AT&T;[16] secondarily the applications contemplated provision of services, along the "backbone" as well as through spurs and future expansion, that in a number of ways would differ significantly from those previously available, e. g., by guarantee of specifically limited data error rates and availability of band widths wider than voice.[17]

On October 4, 1973 AT&T filed a petition to deny the applications, arguing that "the services proposed were neither new nor innovative but duplicated voice and data services already available from the Bell System" and that "the USTS system would affirmatively disserve the public interest by wasteful construction, by misuse of scarce spectrum space, and by diverting from AT&T millions of dollars per year in revenues."[18] In response USTS argued that many of its services would supplement and otherwise add to the services already available and that the AT&T petition to deny was simply an attempt to renew arguments considered and rejected in the *Specialized Carriers* proceeding.

In a Memorandum Opinion and Order released September 13, 1974 the Commission denied AT&T's petition and granted USTS's applications.[19] The Commission identified the issue essentially as "whether the concept of competition as developed in [*Specialized Carriers*] is to be reevaluated in light of these applications."[20] It then noted that "the Commission has adequate regulatory jurisdiction * * * to prevent USTS, or any other carrier competing in the specialized communications market, from employing unfair competitive practices."[21] Finally, it concluded that

the public interest will be served by the addition of a well-financed, competent carrier which we believe USTS will become. Aside from general considerations, we would also note that the instant applications propose substantial new service to the Southeastern United States which is largely unserved at present by specialized carrier facilities.

* * * [W]e find that the proposed facilities would serve the public interest, convenience and necessity, and that USTS is technically, financially and otherwise qualified to construct and operate them for the provision of interstate service. * * *[22]

This appeal followed. Jurisdiction is pursuant to Section 402(a) of the Communications Act, 47 U.S.C. § 402(a) (1970), and 28 U.S.C. §§ 2341–2350 (1970).

---

**15.** The microwave network proposed would consist of 59 backbone sites with spurs added as necessary to serve the major business centers in the corridor area from New York City to Houston, via Philadelphia, Washington, Norfolk, Atlanta, Baton Rouge and other intermediate points. As traffic expands to non-corridor points, USTS states it will weigh the alternative of future investment in additional trunk and spur facilities to reach these new locations. The primary market projected is for the provision of private line analog channels to users having low volume requirements between two points; bulk and data services are contemplated as secondary offerings. Also under consideration are other analog services, including data and alternate voice-data on both a metered and switched basis, plus digital data services in both switched and private line modes. * * *

**16.** *See* Application, Ex. 18, p. 6, JA 19.

**17.** *See id.* at pp. 14, 35, JA 43, 65.

**18.** Appellant's br. at 6–7 (footnote omitted). AT&T's petition to deny was filed concurrently with its more broadly based Moratorium Petition, *see* note 10 *supra,* and the two petitions were cross-referenced. Four other interested carriers also filed petitions to deny.

**19.** *Decision,* 48 FCC2d at 863.

**20.** *Id.* at 860.

**21.** *Id.* at 862.

**22.** *Id.* at 862–863.

48 FCC2d at 859.

## III. THE MERITS

Much of appellant's argument is an attempt to reassert its objections, made in *Specialized Carriers* and subsequently, that a general policy in favor of entry by specialized carriers into the private line communications market is unwarranted. In essence, AT&T argues first of all that if *Specialized Carriers* is given a broad interpretation it violates the principles of *RCA, supra,* and otherwise disserves the public interest by duplicating existing services, wasting spectrum space, and diverting revenues. As indicated above, this initial argument has been considered and rejected by the Commission on several occasions. Moreover, AT&T pressed the argument again in the instant proceeding and again the Commission rejected it, concluding: "We do not believe the circumstances surrounding the instant applications are sufficient to warrant reevaluation of the open entry policy promulgated in [the *Specialized Carriers*] proceeding." [23]

More significantly, this particular argument was finally decided in *Washington Utilities, supra,* where the Ninth Circuit affirmed the Commission's decision in *Specialized Carriers.* Appellants in that case pressed the issues of duplicated services and diverted revenues and expressly argued that *Specialized Carriers,* if read broadly, violated *RCA.* The court examined these issues at some length and concluded:

The Supreme Court's disposition of *RCA Communications* is flatly inconsistent with [appellant's] contention that new entry is impermissible if it will result in duplication of facilities of existing carriers capable of furnishing the service. * * *

\* \* \* \* \* \*

As the Commission puts it, *RCA Communications* stands for the proposition that "while wasteful duplication is generally to be avoided, duplication is not wasteful where a certificating agency appropriately concludes that competition is reasonably feasible and may be expected to have some beneficial effect." 29 F.C.C.2d at 902 n. 20.[24]

The court went on specifically to find the Commission's response adequate on the issues of duplication of services and diversion of revenues.[25] We find no reason to reexamine that holding.

What remains for appellant here, however, is its alternative argument that the Commission in fact intended the *Specialized Carriers* rulemaking to be read not broadly but narrowly and that by granting USTS's application the Commission departed materially from this prior policy without adequate justification or explanation. *See, e. g., Secretary of Agriculture v. United States,* 347 U.S. 645, 74 S.Ct. 826, 98 L.Ed. 1015 (1954). Specifically, AT&T contends that in the *Specialized Carriers* decision "the Commission relied heavily upon the primary objective of new applicants to provide new and different services. This finding played a role of central importance: it enabled the Commission to warrant and explain a major benefit that the Commission expected in authorizing new carriers to meet the contention of unnecessary and wasteful duplication of facilities and services; and it supported the decision's attempt to minimize the risk of harm through traffic diversion, by assuming that the customers of the new carriers would primarily be new customers seeking services not otherwise provided by the existing carriers." [26]

Appellant's narrow interpretation of the reach of *Specialized Carriers,* however, finds no persuasive support in the decision itself and, in fact, it has been plainly rejected not only by the Commission but by the courts and regulatory agencies that have had occasion to examine it. The decision, for instance, speaks in terms generally of "private line services" without differentiating among categories of such services on

---

**23.** *Id.* at 860.

**24.** 513 F.2d at 1159.

**25.** *Id.* at 1159–1160.

**26.** Appellant's br. at 20; *see also id.* at 10–11.

the basis of their present availability.[27] Rather, in its *Specialized Carriers* decision the Commission expressly "contemplate[d] *full* and fair competition in the specialized field among all carriers, both established and new." [28] It stated its ultimate conclusion in broad terms: "a general policy in favor of the entry of new carriers in the specialized communications field would serve the public interest, convenience, and necessity." [29] Moreover, in subsequent interpretation of its *Specialized Carriers* decision the Commission has consistently stressed that one objective of its policy was promotion of full competition over the entire range of private line services and that provision of new and innovative services and development and expansion of the total market, rather than being improvements which an applicant must generate in advance in order to be granted authority to proceed, are merely public benefits which the Commission expects will enure from its policy of competitive entry.[30]

Decisions from both the Third and Ninth Circuits confirm this broad reading of *Specialized Carriers*. In *Bell Telephone Co. of Pa. v. FCC,* 503 F.2d 1250 (3d Cir. 1974), *cert. denied,* 422 U.S. 1026, 95 S.Ct. 2620, 45 L.Ed.2d 684 (1975), the Third Circuit examined the scope of *Specialized Carriers* in order to decide whether the FCC properly ordered AT&T and the Bell Telephone Company of Pennsylvania to provide certain interconnection services to specialized common carriers. The court based its affirmance of the orders in large measure on its finding that in *Specialized Carriers* "the Commission intended to authorize the new carriers to provide all elements of private line services theretofore furnished by the established carriers." [31] And in *Washington Utilities, supra,* the Ninth Circuit, in affirming *Specialized Carriers,* similarly characterized the issue presented to and resolved by the Commission as whether it ought generally to authorize competitive entry to the full market of specialized carriers which offer all types of private line communications including many types already available from or capable of being provided by established carriers.[32] Furthermore, the state regulatory agencies which have had occasion to interpret the Commission's decision have reached similar conclusions in authorizing, pursuant to *Specialized Carriers,* intrastate competitive entry of specialized carriers despite explicit findings that the services proposed were already available from established carriers.[33]

In short, appellant's restricted interpretation is contrary to the plain meaning of *Specialized Carriers.* In announcing a general policy in favor of competitive entry the Commission decided broadly that the public interest, convenience, and necessity would be served by permitting specialized

---

**27.** *See Bell Telephone Co. of Pa. v. FCC,* 503 F.2d 1250, 1262 (3d Cir. 1974), *cert. denied,* 422 U.S. 1026, 95 S.Ct. 2620, 45 L.Ed.2d 684 (1975).

**28.** 29 FCC2d at 916 (emphasis added.)

**29.** *Id.* at 920; *see also Notice,* 24 FCC2d at 327.

**30.** *See, e. g., Bell System Tariff Offerings of Local Distribution Facilities For Use By Other Common Carriers,* 46 FCC2d 413, 424–426, *aff'd, sub nom. Bell Telephone Co. of Pa. v. FCC* 503 F.2d 1250 (3d Cir. 1974), *cert. denied,* 422 U.S. 1026, 95 S.Ct. 2620, 45 L.Ed.2d 684 (1975); *Commission Policies,* 44 FCC2d at 471–472 & n.3.

**31.** 503 F.2d at 1261–1262; *see also id.* at 1270 ("the Commission focused upon the *full field* of private line services theretofore provided by the established carriers" (emphasis in original)).

**32.** *See* 513 F.2d at 1155 ("[t]he proposed service consists of communication of all types of signals, including data and other non-voice traffic"); *id.* at 1157 ("the Commission clearly rejected [appellant's] legal premise that the existence of [a capability in the existing carriers to furnish the services proposed by the specialized carriers] would require rejection of applications from new carriers").

**33.** *The Pacific Telephone & Telegraph Co. v. Southern Pacific Communications Co.,* Case No. 9728, Public Utilities Commission of the State of California, Decision No. 84167 (Interim Opinion, March 4, 1975); *In the Matter of the Application of United Video, Inc.,* Cause No. 24892, Corporation Commission of the State of Oklahoma, Order No. 108727 (Findings, Conclusions and Order, Nov. 14, 1974).

common carriers to provide a full range of private line communications services in direct competition with established carriers so long as the particular applicant is qualified and the proposed service is technically and economically sound. Moreover, the Commission's decision makes good sense. The Commission reasonably determined that its objectives of adding new and innovative services and developing latent submarkets could not be achieved immediately and required in any event that new carriers be allowed to offer a "package" of services some of which necessarily would overlap those already available. It further recognized that a certain amount of "creamskimming" would naturally occur.

> [D]evelopment of new markets must always take place gradually and begin in those particular submarket areas where maximum demand can be stimulated at minimum cost. This is the manner in which all new products and services are introduced, and it is practiced by the established carriers. * * * [34]

In the Commission's view such start-up difficulties are justified and moreover can adequately be controlled by carefully monitoring implementation of its policy.[35] Appellant has not convinced us that this reasonable approach must be disturbed.

█ In arguing for reversal on the ground that the Commission's action in this case represents an unexplained departure from a previously narrow interpretation of *Specialized Carriers*, appellant does not dispute the Commission's adequately supported finding that USTS is financially well qualified and the service it proposes is technically and economically sound. Instead, its argument rests on the absence of a specific finding "that USTS will provide substantial new service, for which there is presently an unmet need." [36] Since we have concluded that this latter contention is based on a faulty premise, there is no basis for reversing the Commission on this ground.[37]

█ Finally, appellant contends that reversal is warranted in any event since the Commission, contrary to Section 309 of the Communications Act, 47 U.S.C. § 309 (1970), failed to hold an evidentiary hearing on factual issues pertinent to the public interest before granting USTS's applications. Section 309 provides for a full hearing whenever the application presents "a substantial and material question of fact." 47 U.S.C. § 309(e). The Commission, of course, has "a large discretion to avoid time-consuming hearings in this field whenever possible." *Southwestern Operating Co. v. FCC*, 122 U.S.App.D.C. 137, 138, 351 F.2d 834, 835 (1965); *Stone v. FCC*, 151 U.S.App. D.C. 145, 466 F.2d 316 (1972). Moreover, the Commission may obviate the need for repetitious hearings on previously considered issues of public policy by establishing, through rulemaking, criteria against which to judge specific applications. *United States v. Storer Broadcasting Co.*, 351 U.S. 192, 202–205, 76 S.Ct. 763, 100 L.Ed. 1081 (1956).[38] In such cases a hearing is not required unless the party opposed to the adopted policies "set[s] forth reasons, sufficient if true, to justify a change or waiver of the [policies]." *Id.* at 205, 76 S.Ct. at 772. As the Ninth Circuit stated, in a somewhat different context, with regard to the *Spe-*

---

**34.** *Specialized Carriers*, 24 FCC2d at 333–334.

**35.** *See Commission Policies*, 44 FCC2d at 471 n.2, 473.

**36.** Appellant's br. at 17.

**37.** Having decided that *Specialized Carriers* authorizes full competition over the entire range of private line communications services and does not require at this early stage that each applicant demonstrate its ability immediately to provide new and innovative services, we need not reach and therefore express no view on the additional argument that in any event

USTS did propose new services which would qualify under *Specialized Carriers* even if AT&T's narrow interpretation were adopted. *See* br. for intervenor USTS at 38–42.

**38.** *Accord, Tucson Radio, Inc. (KEVT) v. FCC*, 147 U.S.App.D.C. 48, 452 F.2d 1380 (1971); *560 Broadcasting Corp. v. FCC*, 135 U.S.App.D.C. 330, 418 F.2d 1166 (1969); *WBEN, Inc. v. United States*, 396 F.2d 601 (2d Cir.), *cert. denied*, 393 U.S. 914, 89 S.Ct. 238, 21 L.Ed.2d 200 (1968); *see also Washington Utilities, supra; Bell Telephone, supra.*

*cialized Carriers* rulemaking: "Though the Commission said it would pass separately upon the merits of each pending application, presumably the rule would govern individual cases. That is its function." *Washington Utilities*, 513 F.2d at 1164.

█ In the instant case AT&T's argument that the Commission wrongfully denied it a Section 309 hearing rests, as does much of its argument throughout, on the assumption that the Commission was required, in light of the *RCA* decision, to determine that USTS would immediately provide new and innovative service, would develop latent submarkets, and would not otherwise duplicate existing services or divert revenues from established carriers. AT&T does not argue that its petition to deny raised substantial and material questions of fact regarding the financial qualifications of USTS or the technical soundness of its proposed services. In essence, AT&T concedes that unless its arguments on duplication of services and diversion of revenues are accepted it has no claim that its right to a Section 309 hearing was violated. But as discussed above AT&T's underlying assumption is faulty. *Specialized Carriers* decided those issues in favor of full competition. Consequently, the Commission was not presented with "specific facts and circumstances which would make the general rule inapplicable" and accordingly it was not required to hold a hearing. *Tucson Radio, Inc. (KEVT) v. FCC*, 147 U.S.App. D.C. 48, 50, 452 F.2d 1380, 1382 (1971).

## IV. CONCLUSION

The Commission is still in the early stages of evaluating the success or failure of the policies adopted in *Specialized Carriers*. It has given repeated assurance that it will carefully monitor the progress of this program in order to avoid unfair competition. The Commission's position is reasonable and adequately supported, and it has been consistently applied. It has been judicially approved on direct review. This appeal presents no occasion to disturb those determinations.

*Affirmed.*